**UNITED STATES of America**

v.

**Jesse Issa MAALI, M. Saleem Khanani, Big Bargain World, Inc., SS Mart, Inc., Jeans Unlimited, Inc., Denim Unlimited, Inc., Barakat Corporation, Barakat International, Inc., David Portlock**

No. 6:02–CR–171–ORL28KRS.

United States District Court,
M.D. Florida.
Orlando Division.

Aug. 8, 2004.

Robert Alan Leventhal, Leventhal & Slaughter, Mark E. Nejame, Nejame, Harrington & Barker, P.A., Jesse Issa Maali, Russell Eugene Crawford, Law Office of Russell E. Crawford, Orlando, FL, Mark

P. Schnapp, Greenberg Traurig, P.A., Miami, FL, Tucker H. Byrd, Greenberg Traurig, P.A., Gregory N. Miller, Law Office of A. Brian Phillips, P.A., M. Saleem Khanani, Donald A. Lykkebak, Law Office of Donald A. Lykkebak, Charles M. Greene, Law Office of Charles M. Greene, P.A., Orlando, FL, W. Bryan Park, II, Law Offices of W. Bryan Park II, Khan Aslam, Winter Park, FL, Roland Augustine Hermida, Roland A. Hermida, Tampa, FL, John David Galluzzo, John D. Galluzzo, P.A., Saeedullah Awan, Fern Park, FL, Donald R. West, Law Office of Donald R. West, Robert James Buonauro, Law Office of Robert J. Buonauro, Mahmood Jamal, Mark E. Nejame, Nejame, Harrington & Barker, P.A., Orlando, FL, Joseph A. Fisher, III, Chandler Robinson Muller, Law Office of Chandler R. Muller, Robert B. White, Jr., Sobering, White & Luczak, P.A., David Portlock, Winter Park, FL, for Defendants.

Cynthia Hawkins Collazo, U.S. Attorney's Office Middle District of Florida, Orlando, FL, for Plaintiff.

## ORDER

ANTOON, District Judge.

The Defendants[1] in this case have been charged in a 71–count Third Superseding Indictment with crimes involving employment and harboring of aliens and tax evasion.[2] This Order addresses the Defendants' motions to suppress evidence seized

---

1. In addition to the nine Defendants whose motions are addressed by this Order, there are three other Defendants in this case: Khan Aslam, Saeedullah Awan, and Mahmood Jamal. (*See, e.g.,* Doc. 1). Defendants Aslam and Awan have entered pleas of guilty and are awaiting sentencing. (*See* Docs. 159, 162, 192, 200, 205, 237, 240, 376, & 379).

2. In Counts One through Fifty–Three, the Defendants are charged with encouraging and inducing aliens to reside in the United States in violation of 8 U.S.C. § 1324. In Count

Fifty–Four, the Defendants are charged with conspiring to conceal, harbor, and shield aliens from detection and conspiring to encourage and induce aliens to enter and reside in the United States, in violation of 8 U.S.C. § 1324. In Count Fifty–Five, the Defendants are charged with conspiring to launder money in violation of 18 U.S.C. §§ 1956 and 1957. In Count Fifty–Six, the Defendants are charged with defrauding the State of Florida and the United States in violation of 18 U.S.C. §§ 1343 and 2. In Count Fifty–Seven, the

during a wide-scale search and seizure operation that was conducted in November 2002.[3] Having considered the parties' written submissions and oral argument, as well as the evidence and testimony presented at a nine-day evidentiary hearing, the Court concludes that the Defendants' motions shall be granted in part and denied in part. Some, but not all, of the seized evidence shall be suppressed.

## I. Background

Defendants Jesse Maali ("Mr. Maali") and M. Saleem Khanani ("Mr. Khanani") are businessmen who own and operate several businesses together in the Orlando, Florida area. Mr. Maali and Mr. Khanani also are each involved in other businesses independent of one another, that is, in which the other of them has no interest. Among the businesses in which they are both involved are Defendants Big Bargain World, Inc. and SS Mart, Inc., entities which in turn own several "Big Bargain World" ("BBW") stores that sell retail merchandise, primarily to tourists. Mr. Maali and Mr. Khanani are also the sole officers and shareholders of Sports Domi-

---

Defendants are charged with defrauding the State of Florida and the United States in violation of 18 U.S.C. §§ 1341 and 2. In Count Fifty–Eight, the Defendants are charged with conspiring to evade or defeat federal employment taxes and federal income taxes, in violation of 26 U.S.C. § 7201 and 18 U.S.C. § 371. Finally, in Counts Fifty–Nine through Seventy–One, the Defendants are charged with attempting to evade and defeat federal employment and income taxes, in violation of 26 U.S.C. § 7201 and 18 U.S.C. § 2.

The recently-filed Third Superseding Indictment (Doc. 552) contains the same charges as the Second Superseding Indictment (Doc. 330) and was filed in light of the recent Supreme Court decision in *Blakely v. Washington*, —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), regarding factual findings for sentencing purposes. (*See* Mins. of 07/12/04 Status Conference, Doc. 537).

3. The motions, responses, and briefs before the Court are: Motion of Defendant Saleem Khanani to Suppress Unlawfully Seized Evidence (Doc. 243); Motion to Suppress Tangible Evidence (Doc. 266) filed by Defendant David Portlock; Government's Response to Defendants Khanani's and Portlock's Motions to Suppress (Doc. 277); Motion to Suppress Evidence and for Return of Property (Doc. 282) filed by Defendants Jesse Issa Maali, Big Bargain World, Inc., SS Mart, Inc., Jeans Unlimited, Inc., Denim Unlimited, Inc., Barakat Corporation, and Barakat International, Inc.; Government's Response to Defendant[s'] Motion to Suppress Evidence and for Return of Property (Doc. 305); Defendant Portlock's Reply and Supplemental Motion to Suppress Tangible Evidence (Doc. 306); Government's Response to Defendant's Motion to Suppress (Doc. 307); Government's Response to Defendant's Reply and Supplemental Motion to Suppress Tangible Evidence (Doc. 309); Defendant Portlock's Brief Concerning the Fourth Amendment Suppression Issues and the Evidentiary Hearing Held Thereon (Doc. 413); Defendant Saleem Khanani's Supplemental Brief in Support of Motion to Suppress Unlawfully Seized Evidence (Doc. 414); Defendants, Jesse Issa Maali, Big Bargain World, Inc., SS Mart, Inc., Jeans Unlimited, Inc., Denim Unlimited, Inc., Barakat Corporation and Barakat International, Inc.'s Memorandum in Support of Their Motion to Suppress Evidence and for Return of Property (Doc. 415); Government's Response to Defendants' Arguments in Support of Defendants' Motions to Suppress (Doc. 430); Defendant Portlock's Reply Concerning Fourth Amendment Suppression Issues (Doc. 436); Defendant M. Saleem Khanani's Reply to the Government's Response to Defendants' Arguments in Support of Defendants' Motions to Suppress (Doc. 443); and Defendants, Jesse Maali, Big Bargain World, Inc., SS Mart, Inc., Jeans Unlimited, Inc., Denim Unlimited, Inc., Barakat Corporation, and Barakat International, Inc.'s Reply to Government's Response to Defendants' Arguments in Support of Defendant[s'] Motions to Suppress (Doc. 445). Additionally, a nine-day evidentiary hearing was held on these motions. (*See* Docs. 317, 318, 321, 340, 351, 371, 372, 382, 383, 385, & 417–25). Finally, after the parties had submitted their post-hearing briefs, on May 20, 2004 the court heard oral argument on the motions to suppress. (*See* Docs. 466 & 565).

nator, Inc., a BBW spinoff that sells sports-related retail merchandise in "Sports Dominator" stores. Defendant David Portlock ("Mr. Portlock") is an accountant who has performed accounting services for Mr. Maali, Mr. Khanani, and their businesses; his accounting business also has many other clients who are in no way connected with this case.

On November 6, 2002—the same day that an Indictment was filed under seal against most of the current Defendants[4]— United States Magistrate Judge James G. Glazebrook authorized search warrants for thirteen locations: seven BBW stores; two Sports Dominator stores; a BBW corporate office/warehouse; the office of Mr. Portlock; the office of Maali Enterprises; and the residence of Mr. Maali. Additionally, on November 14, 2002, after searches of the first thirteen locations had begun, United States Magistrate Judge David A. Baker authorized a search warrant for a fourteenth location—a Shurgard storage unit that had been rented by Mr. Portlock. These search warrants were issued after the magistrate judges had been presented with a 59–page, 93–paragraph "Master Affidavit" (Khanani Ex. 14)[5] sworn to by Agent Donald Buechner of the Immigration and Naturalization Service ("INS"), now known as Immigration, Customs, and Enforcement ("ICE"). The fourteenth warrant was also supported by an additional affidavit attested to by DEA Special Agent Timothy Jones. (See Government's Ex. 14).

In the Master Affidavit, Agent Buechner described an investigation by a multi-agency task force of Mr. Maali and his businesses that had been underway since 1999. Agent Buechner stated that based on that investigation, there was probable cause to believe that searches of thirteen sites would

> lead to evidence of violation of federal law, including but not limited to: Title 8, United States Code, Section 1324(a)(1)(A)(iv), (encouraging or inducing undocumented aliens to come to, enter, or reside in the United States): Title 8, United States Code, Section 1324(a)(1)(A)(v)(I) (conspiracy to violate); Title 8, United States Code, Section 1324(a)(1)(A)(v)(II), (aiding and abetting the commission of any 1324(a)(1)(A) offense); Title 8, United States Code, Section 1324(a)(1)(A)(iii), (harboring aliens); and Title 26, United States Code, Sections 7201 and 7206, (Evasion of Employment Tax and False Employment Tax Returns).

(Master Aff. at 2 ¶ 3).

In the Master Affidavit, Agent Buechner recounted the task force's investigation of the subject businesses, the employment of aliens[6] by some of those businesses, and the manner in which the aliens were paid so as to avoid both detection by immigration officials and employment taxes. The task force investigators had determined through analysis of records and from conversations with cooperating informants

---

**4.** The Indictment named as Defendants all of the current Defendants except Mr. Portlock. (See Doc. 1). Mr. Portlock was first named as a Defendant in the First Superseding Indictment, which was filed on December 11, 2002. (Doc. 116).

**5.** Unless otherwise specified, references to exhibits herein are to the exhibits submitted at the evidentiary hearing rather than to exhibits attached to motions or memoranda.

**6.** "Aliens" are sometimes referred to—in the record in this case, in case law, and in everyday usage—as "illegal" or "unauthorized." For the purposes of this Order, any distinction between these terms is not at issue, and the words "aliens," "unauthorized aliens," and "illegal aliens" may be used interchangeably herein, it being understood that employment of "aliens" is not per se unlawful but instead depends on the status of the aliens.

that aliens had been employed at BBW stores "during the period January 1, 1999 through October 2002, . . . and an elaborate scheme was used to hide payments to those aliens and disguise them as legitimate business transactions." (Master Aff. at 4 ¶ 10). The payments were hidden through the establishment and use of four "shell company" accounts which were funded by proceeds from the retail sales of the businesses—proceeds which were disguised as operating expense payments to supposed vendors.

The Master Affidavit lists by name more than fifty employees who were determined either never to have been authorized to work at Big Bargain World, not to have been authorized during at least part of their employment, or to have been paid from the shell company accounts but not reported as employees to the Florida Department of Revenue or the IRS. (Master Aff. at 8–25 ¶¶ 18–20). Also listed as to these employees are dates of birth, country of citizenship (where known), dates of entry into the country, and the amounts of payments received by them. (Master Aff. at 8–25 ¶¶ 18–20). At least six of the employees paid through the four shell company accounts were listed as employees of Sports Dominator on Sports Dominator's Florida unemployment tax returns for 2000 and 2001. (Master Aff. at 47 ¶ 73).

The Master Affidavit states that while "legitimate" employees of the businesses were paid regular wages through payroll bank accounts by a payroll company used by the businesses, between 1999 and 2001 unauthorized aliens were paid through a separate system using the accounts of the four shell companies—entities named T & S Printing, Florida Freight, Rainbow Merchandising, and Center Care Maintenance. (Master Aff. at 6–7, 8 ¶ 17). The shell company accounts had been established in 1999 by two BBW employees, Defendants Khan Aslam and Saeedullah Awan, who were under the direct control of Mr. Maali and Mr. Khanani. (Master Aff. at 6–7 ¶ 14).

During 1999, 2000, and 2001, checks were written from the accounts of these shell companies to pay the unauthorized aliens' wages. (Master Aff. at 5 ¶ 12). However, in June 2001—shortly after grand jury subpoenas were served on the banks that held the shell companies' accounts—the payments from these accounts stopped, and after that date the aliens were instead paid with cash. (Master Aff. ¶¶ 12, 16). Additionally, shortly after the grand jury subpoenas were served, three of the shell company accounts were closed, and activity in the fourth shell company account ceased. (Master ·Aff. at 7 ¶ 16).

These four "shell companies provided no discernable service to their owners and were set up exclusively to conceal the criminal activity." (Master Aff. at 6 ¶ 14). The shell company accounts were funded by sales and rental income from Mr. Maali and Mr. Khanani's businesses; the Master Affidavit states that "[b]etween February 1999 and May 2001, approximately $2.25 million of Maali and Khanani sales and rental income was used to fund the four shell companies' accounts, which were in turn used to pay the unauthorized alien and other employees working at Big Bargain World stores, the corporate office, and the warehouse." (Master Aff. at 7 ¶ 15).

The disguising of payments as expenses was achieved as follows. Funds received from sales of merchandise were deposited into "depository accounts," and then transfers were made to expense accounts; as funds were needed to pay unauthorized alien employees, checks were written on expense accounts payable to one or more of the four shell companies, who then

wrote checks to the unauthorized employees. (Master Aff. at 28 ¶ 25). The funds that were deposited into the four shell company accounts came from eight different bank accounts controlled by Mr. Maali and Mr. Khanani, including accounts in the names of Defendants Big Bargain World, Inc., SS Mart, Inc., Denim Unlimited, Inc., Jeans Unlimited, Inc., and Barakat Corporation. (Master Aff. at 28–29 ¶ 25). The checks were signed by Mr. Maali or Mr. Khanani. (Master Aff. at 29 ¶ 25). Many of the aliens' paychecks were then cashed at the BBW stores. (Master Aff. at 29 ¶ 25).

The wages that were paid through the four shell company accounts were not reported on employment tax returns filed with the State of Florida or the IRS. (Master Aff. at 29 ¶ 27). The four shell companies did not file any employment tax returns for 1999, 2000, or 2001, and none of the companies who contributed funds to the four shell accounts reported the unauthorized aliens on their employment tax returns. (Master Aff. at 29 ¶ 27). Thus, "the cost of the taxes associated with those wages were evaded." (Master Aff. at 29 ¶ 27). The Master Affidavit further states that "[i]n addition to the Big Bargain World and SS Mart employment tax returns therefore being false, the corporate tax returns for those entities would also be false if the payments were deducted as other types of operating expenses." (Master Aff. at 29–30 ¶ 27). The use of the four shell company accounts also enabled the aliens to be shielded from detection by the INS; proper reporting on the employment tax returns would have put them at risk of detection due to the use of false social security numbers. (Master Aff. at 30 ¶ 28).

The Master Affidavit also reports that in 1998 the Department of Labor ("DOL") had investigated "the payment of employees at three Big Bargain World stores." (Master Aff. at 5 ¶ 13). At the end of that investigation, "Big Bargain World, represented by [its] accountant David Portlock, admitted not paying [its] employees proper overtime, and submitted proper payment." (Master Aff. at 5 ¶ 13). As part of the DOL investigation, Mr. Portlock and another accountant "were provided verbal and written instructions on the proper calculation and payment of overtime, child labor laws, and the proper completion of I–9 forms"—forms that employers are required "to fill out on every employee prior to the start of employment." (Master Aff. at 5–6 ¶ 13).

The Master Affidavit notes that two confidential informants ("CIs") had provided information to the task force. Both of these CIs were former BBW employees who were not authorized to work in this country during at least part of the time they were employed there. (Master Aff. ¶¶ 29, 31, 37). Neither of the CIs had filled out an I–9 form upon hire or completed the social security number box on their applications. (Master Aff. ¶¶ 29, 37). As to at least one of the CIs, Mr. Khanani was aware of the lack of work authorization. (Master Aff. ¶¶ 29, 31). Agent Buechner also noted that he had arrested other unauthorized aliens who had formerly worked at BBW, and those aliens had stated that they had not filled out I–9 forms upon hire either. (Master Aff. at 33 ¶ 38).

According to CI–1, BBW did not deduct social security taxes, federal income taxes, or state deductions from unauthorized aliens' salaries. (Master Aff. at 32 ¶ 33). CI–1 also reported that the employees were told that if INS came to the store, a PA announcement, "Pick up line 7," would be made; there was really no line 7, and this was merely a signal regarding the presence of INS. (Master Aff. at 32 ¶ 34).

The illegal "[e]mployees were then supposed to pretend to be customers, or to go to a nearby restaurant." (Master Aff. at 32 ¶ 34). BBW also, according to CI–1, provided letters for the illegal employees to present to apartment complexes so that they could rent apartments. (Master Aff. at 32 ¶ 34).

CI–1 also described a practice at BBW whereby sales were rung up until a designated total was achieved at a particular register; after that total was reached, the register was not used any more during that shift. (Master Aff. at 32 ¶ 36). Registers were cleared at the end of each shift, and the practice was reversed at the next shift. (Master Aff. at 33 ¶ 36). CI–1 believed that not all sales receipts were being reported so that sales taxes could be avoided. (Master Aff. at 33 ¶ 36).

The Master Affidavit also recounts surveillance that the task force had conducted, (Master Aff. at 34–38 ¶¶ 39–50), and describes documents that had been recovered from trash receptacles at several of the sites for which search warrants were sought. (Master Aff. at 37–42 ¶¶ 51–68). For example, envelopes addressed to Mr. Portlock, Barakat Corporation, BBW, and others were recovered from the trash at Maali Enterprises (Master Aff. at 37–38); blank business checks with the name "T & S Printing" (one of the four shell companies) and documents of BBW, Sports Dominator, Jeans Unlimited, Denim Blues, and Barakat Corporation were found in the trash at the BBW warehouse at 5858 Lakehurst Drive (Master Aff. at 38–40); an advertising brochure for Dunkin Donuts, TOGO's, and 31 Baskin Robbins—other of Mr. Maali's businesses—was also found at the 5858 Lakehurst warehouse (Master Aff. at 40 ¶ 61); a copy of Mr. and Mrs. Maali's 2001 From 1040 tax return was found in the trash at Mr. Portlock's office at 7345 Sand Lake Road (Master

Aff. at 42 ¶ 67); and an envelope addressed to Big Bargain World, Inc. at 6454 International Drive from PayChex was recovered from the trash receptacle at Mr. Maali's residence (Master Aff. at 42 ¶ 68).

Agent Buechner explained that "[t]he financial documents related to Big Bargain World, SS Mart, Sports Dominator, Denim Unlimited, Jeans Unlimited, and Barakat Corporation are essential to determine whether the corporate income and employment tax returns filed with the State of Florida and IRS are true and correct, and determine the amount, if any, of taxes evaded through the scheme." (Master Aff. at 43 ¶ 70). Additionally, "[t]he records are also needed to determine the source of the cash used to pay the illegal aliens and others after the four shell companies' accounts were closed, and to further identify illegal alien employees that the CIs were not aware of." (Master Aff. at 43 ¶ 70).

The Master Affidavit concludes with 6½ pages describing a request for permission to search for and seize computers from the thirteen sites (Master Aff. at 51–57 ¶¶ 82–91). Agent Buechner explained that the government sought to seize computers and related equipment "in order to properly search the contents of those devices." (Master Aff. at 56 ¶ 89). Agent Buechner then requested the issuance of search warrants for the thirteen described premises and "authorization to seize the items detailed in Attachment B" to the Master Affidavit. (Master Aff. at 59 ¶ 93).

As noted earlier, this Master Affidavit was presented to a magistrate judge on November 6, 2002, and the magistrate judge issued warrants for thirteen sites that same day. After searches of those sites had begun on November 14, 2002, the fourteenth warrant was sought and obtained from another magistrate judge. Each of the warrants provides that based on the Master Affidavit of Agent Buechner

(and, in the case of the fourteenth warrant, based also on the affidavit of DEA Agent Timothy Jones, which incorporates by reference Buechner's Master Affidavit), U.S. Marshals and other authorized federal officers were commanded to search the named premises and to search for and seize the property listed in Attachment B, "which is contraband and/or evidence of the commission of a criminal offense, concerning violations of Title 8, United States Code, Section 1324(a)(1)(A) and Title 26, United States Code, Sections 7201 and 7206." (Khanani Exs. 1–13; Government's Ex. 14).

Each warrant had two attachments: Attachment A, which describes the individual site to be searched and which varies from warrant to warrant; and Attachment B, which was the same as to each warrant except for the fourteenth warrant[7] and which is identical to Attachment B to the Master Affidavit. Attachment B is comprised of three paragraphs. Paragraph A of Attachment B provides in part as follows:

7. Attachment B to the fourteenth warrant contains the same Paragraph A and Paragraph B as does Attachment B to the other warrants and the Master Affidavit. However, Paragraph C of the fourteenth warrant's Attachment B contains 12 rather than 18 categories of items to be seized. (*See* Government's Ex. 14). The twelve categories in Paragraph C of the fourteenth warrant's Attachment B are identical to categories 1–4 and 6–13 of Paragraph C of the other warrants' Attachment B. The categories omitted from Paragraph C of the fourteenth warrant's Attachment B are Category 5 ("Appointment journals, Rolodexes, desk calendars, telephone logs, and any other documents with notations of contacts with investors and/or employees") and Categories 14–18, which pertain to computer equipment.

8. This definition paragraph provides:

B. When used in this Attachment, the terms "documents" and "records" include but are not limited to, originals, all inter-

A. Items and information to be seized shall include the records, documents, and property described in Paragraph C found at the below-listed premises, for the time period 1997 to present relating to the employment and harboring of illegal aliens. The items and information being sought are financial documents and records of the entities[ ] Big Bargain World, SS Mart, Sports Dominator, Denim Unlimited, Jeans Unlimited, Barakat Corporation, Florida Freight and Distributors, Center Care Maintenance, T & S Printing, and Rainbow Merchandising; as well as the individuals Jesse Maali, Saleem Khanani, Khan Aslam, and Saedullah Awan . . . .

The rest of Paragraph A is a list of the first thirteen search sites. Paragraph B of Attachment B provides a definition of "documents" and "records" as used therein.[8] Finally, Paragraph C of Attachment B lists eighteen categories of property to be seized from the thirteen locations, including but not limited to financial records, employee records, and computer equipment.[9]

im drafts, and each copy of any writing containing any inter lineation, deletion, marginal notes, or which is otherwise nonconforming; and any tangible items of readable or visual material, whether printed, typed, handwritten, microfilmed, or recorded on tape, disk, or other means of recording; as well as computer records, computer equipment, and components. (Attach. B to Master Aff., ¶ B).

9. Paragraph C provides:

C. The property to be seized includes the following:
1. Financial records, including books, ledgers, journals, work-papers, spreadsheets, sales receipts, payment receipts, notes payable and receivable, cash register tapes, inventory records and financial statements related to the businesses listed in paragraph A above;
2. Bookkeepers and/or accountants' work papers used in the preparation of

Note 9—Continued

corporate tax returns, retained copies of all federal and state income, payroll and excise tax returns related to the businesses listed in paragraph A above;

3. Corporate minute books, stock registers or other records reflecting ownership of corporate stock related to the businesses listed in paragraph A above;

4. Bank documents, including records of all checking[,] savings and other deposit accounts, including all statements, deposit slips and items, withdrawals, canceled checks, debit and credit memos, records of wire transfers[,] cashiers' checks, cashiers' checks receipts, money orders, money order receipts, official bank checks, certificates of deposit, correspondence, and any other records of financial transactions;

5. Appointment journals, Rolodexes, desk calendars, telephone logs, and any other documents with notations of contacts with investors and/or employees;

6. Loan records, including applications, financial statements, descriptions of loan collateral, credit and background investigations required, loan agreements, notes or mortgages, settlement sheets, contracts, retained copies of checks issued for loan [sic], repayment records, including records revealing the date, amount and method of repayment (cash or check), checks used to repay loans and records disclosing the total amount of discount or interest paid annually, records of any liens, loan correspondence, and internal memoranda relative to these loans;

7. Documents and records of all monies and assets held in foreign accounts;

8. Records of all charge cards, including applications, monthly statements, invoices, and records of payments, to include personal and business accounts related to the persons and businesses listed in paragraph A above;

9. Personnel records, including personnel files, applications, INS Form I–9's, as well as listing of names, addresses, telephone numbers, dates of birth, social security numbers, and any alien registration numbers of current and past employees and their dependents, time and attendance records, time cards, work schedules, vacation schedules, IRS Form W–4's, Employee's Withholding Allowance Certificate; IRS Form 941's, Employee's Quarterly Federal Tax Return;

correspondence; and termination files/notices;

10. Employee insurance records, including workers' compensation information, applications, withholding authorizations, cards, claims, claim files, eligibility lists, premium statements, employee insurance remittance forms, termination files and/or notices, and workers' compensation information;

11. Payroll records including check stubs, pay checks, rates of pay for each employee, IRS Form W–2's, 1099 Forms, state unemployment payment records, and related correspondence;

12. Copies of employee documents used to establish identity and employment eligibility; all identity documents and indicia of alienage, including passports; visas; travel documents; seaman's books; crew letters; INS Forms 1–94, Arrival/Departure Record; I–94W, Arrival/Departure Record, Visa Waiver; 1–95, Crewman's Landing Permit; and documents supporting entry into the United States by any person employed now or in the past at the Big Bargain World, SS Mart, Inc., Sports Dominator, Jeans Unlimited, Inc., Denim Unlimited, Inc., Barakat Corporation, and Barakat International, Inc.;

13. U.S. currency that appears to be the proceeds of the businesses listed in Paragraph A above, checks made payable to one of the businesses or individuals listed in Paragraph A above, credit card receipts, and deposit slips;

14. Computers and all related "computer hardware," which refers to all equipment which can collect, analyze, create, display, covert [sic], store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes, but is not limited to, any data-processing device (such as a central processing unit or a self-contained "laptop" or "notebook" computer); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, transistor-like binary devices, and other memory storage devices); peripheral input/output devices (such as keyboards, scanners, printers, and video display monitors); and related communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic

Searches pursuant to all fourteen warrants were conducted on November 14, 2002. The execution of the searches involved approximately 200 law enforcement officers from several different law enforcement agencies, including but not limited to the FBI, DEA, INS, the Orange County Sheriff's Office. Most of the searching agents had not previously been involved in the task force investigation. However, the search team members were briefed the day before and the morning of the search; during those briefings copies of the Master Affidavit and search warrants were provided to the searchers.

On the day of the searches, hundreds of boxes of documents were seized, as were nearly a hundred computer hard drives. Other items besides documents and computers were also seized. The seized items were then stored at a facility that the FBI rented specifically for that purpose at an office park in Maitland, Florida. The seized computer hard drives were copied or "mirrored" and the hard drives were returned to the Defendants approximately one week after the searches. Many of the documents and other items seized have also since been returned.

It is undisputed that many of the items that were seized are neither relevant to the investigation nor responsive to the warrants, including records of other businesses and some personal items belonging to employees or family members of the Defendants. However, the parties do dispute the appropriate remedy for the overly broad seizure and whether some items that have not yet been returned by the Government should be ordered returned.

## II. Discussion

The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks); 15. "Computer software," which refers to digital information which can be interpreted by a computer and any of its related components to direct the way computer systems work. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (such as word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs; 16. "Computer-related documentation," which refers to written, recorded, printed, or electronically stored material that explains or illustrates how to configure or use computer hardware or computer software, or related items; 17. "Computer passwords and other data security devices," which refer to apparatuses designed to restrict access or to hide computer software, documentation, or date [sic]. Data security devices may consists of hardware, software, or other programming code. A password is, in general, a string of alphanumeric or other special characters. Data security hardware may include encryption devices, chips, and circuit boards; and 18. Electronic devices which are capable of analyzing, creating, displaying, converting, or transmitting electronic or magnetic computer impulses or data. These devices include computers, computer components, computer peripherals, word processing equipment, modems, monitors, printers, plotters, encryption circuit boards, optical scanners, internal hard drives, and other computer related electronic devices[.]

As to the seizure of computers and computer components, the government will return the computers promptly after retrieving and storing the information contained therein, which period will not exceed ten days.

(Attach. B to Master Aff., ¶ C).

violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." In their motions to suppress, the Defendants seek suppression of all seized evidence based on several portions of this provision.

The Defendants challenge both the search warrants themselves and the manner in which the searches and seizures pursuant to those warrants were carried out. They argue that the search warrants were facially invalid because they were unconstitutionally overbroad and lacking in particularity, and they assert that the agents who executed the warrants seized items that were beyond the scope of even the overbroad warrants. The Defendants argue that the invalidity of the warrants

was not cured by good-faith reliance on the warrants by the searching officers, and the Defendants aver that the manner in which the search was conducted and the seizure of numerous items beyond the warrants' terms mandates wholesale suppression of all evidence seized—even evidence admittedly within the terms of the warrants.[10] Additionally, Mr. Khanani argues that the search of an office at 6458 International Drive was completely unauthorized because no warrant was obtained for that location.[11] The motion filed by Mr. Maali and the corporate Defendants further seeks return of improperly seized property. After brief mention of the threshold issue of the Defendants' standing as to the fourteen search locations, the substantive issues raised with respect to the searches will be addressed in turn.

**10.** The concept of "good faith" can arise in two different ways in the search context. The first way is that if a search warrant is found to be invalid on its face, good-faith reliance on the warrant by the searching agents can "save" the warrant and render the evidence seized under it admissible despite the warrant's shortcomings. This doctrine was established in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), and is rooted in the basis for the exclusionary rule—to deter police misconduct—a purpose which is not served where the searching officers reasonably rely on a warrant issued by a neutral and detached magistrate. *See, e.g., Leon*, 468 U.S. at 922, 104 S.Ct. 3405 ("[T]he marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion.").

Once a warrant is found to be valid, the *Leon* good-faith doctrine no longer comes into play because there is no warrant that needs to be "saved" by the searchers' reasonable reliance. Nevertheless, the conduct of the searchers is still relevant in another way. If the searchers seize items beyond the scope of the warrant, and do so with "flagrant disregard" for the warrant's terms, then suppression of all evidence, rather than just the evidence beyond the warrant's scope, may be the

appropriate remedy. *See, e.g., United States v. Wuagneux*, 683 F.2d 1343, 1354 (11th Cir. 1982); *see also United States v. Wick*, 52 F.Supp.2d 1310, 1317 (D.N.M.1999) ("[B]lanket suppression is only appropriate when the officers 'deliberately and flagrantly disregard the terms of the warrant; in other words, when the officers, in bad faith, use the warrant as a general grant of authority to search and seize whatever they like.").

In sum, if the warrant is found to be deficient *Leon* good faith comes into play, but if the warrant is held valid the conduct of the officers pertains not to "saving" the warrant but perhaps to the scope of suppression. The Defendants have raised "good faith" as a third discrete issue, but it is treated herein as a subissue of the search-execution issue— whether the terms of the warrants were "flagrantly disregarded."

**11.** Initially, Mr. Portlock additionally argued that his Shurgard storage unit was searched without a warrant, (*see* Doc. 266); however, Mr. Portlock has since learned that there was indeed a warrant for that location—the fourteenth search site previously mentioned herein (*see* Doc. 306). Mr. Portlock thus no longer challenges the *lack* of a warrant for that location, but he does contest the *sufficiency* of the warrant for that location as well as of the warrants for the other searched locations.

### A. Standing

In his motion, Mr. Khanani asserts that he has standing to object as to all of the search locations except for the Maali Enterprises office and the Maali residence. The Government contends, however, that Mr. Khanani and all of the other Defendants except Mr. Portlock also lack standing as to Mr. Portlock's office and storage unit, and the Government argues that Mr. Portlock has standing only as to those two locations. Mr. Portlock makes arguments as to sites beyond his office and storage unit, but he apparently concedes that he has standing only as to his office and storage unit and states that his arguments about the other sites go to show the flagrant disregard of the warrants as a whole. (See Doc. 306 at 3–4). In any event, it is clear that with respect to each of the fourteen sites there is at least one Defendant who has standing to object as to the search thereof. Thus, no further discussion of the issue of standing is necessary.

### B. The Specificity of the Warrants

The Defendants raise several challenges to the sufficiency of the warrants. Although the Defendants do not contend that probable cause for issuance of the warrants was totally lacking, they argue that the warrants provided for seizure of items beyond the scope of the narrow probable cause showing made in the Master Affidavit and that the warrants did not particularly describe the things to be seized as required by the Fourth Amendment. The Defendants assert that the eighteen categories in Attachment B to the warrants and Master Affidavit include every possible type of business or personal financial record of the Defendants and that several of the categories do not bear any relationship to the crimes alleged to have been committed. The Defendants also argue that there was a lack of specification as to what type of evidence would be found at each of the fourteen locations, and they further aver that the warrants improperly called for seizure of each category of record without requiring examination of the records to determine whether the record pertained to the employment tax or INS violations for which probable cause had been provided. The Defendants contend that this overbreadth and lack of particularity rendered the warrants "general warrants" improperly authorizing the wholesale seizure of records. Additionally, the Defendants challenge the warrants' computer-seizure provisions. Finally, Mr. Portlock asserts that the fourteenth warrant is deficient for lack of a specific date, and Mr. Portlock also challenges the sufficiency of the probable cause allegations of the Master Affidavit as to his office and storage unit.

■ The issuing magistrate judge's determination that probable cause exists for a search warrant is entitled to deference. Indeed, the Supreme Court has "repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review. A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'" Illinois v. Gates, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (quoting Spinelli v. United States, 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969)); see also Massachusetts v. Upton, 466 U.S. 727, 732–733, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984) (finding error by appellate court "in failing to grant any deference to the decision of the Magistrate to issue a warrant," noting that "[a] grudging or negative attitude by reviewing courts toward warrants' is inconsistent with the desire to encourage use of the warrant process by police officers and with the recognition that once a war-

rant has been obtained, intrusion upon interests protected by the Fourth Amendment is less severe than otherwise may be the case") (quoting *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965)); *United States v. Nixon,* 918 F.2d 895, 900 (11th Cir.1990) ("The issuing magistrate is to make a 'practical, common-sense decision' about whether the 'totality of the circumstances' indicate that there is probable cause that the sought-for evidence will be obtained. The standard for our review of the magistrate's determination is 'simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed.' We have also said that the practical nature of the magistrate's decision justifies 'great deference' upon review and calls for upholding the magistrate's findings even in marginal or doubtful cases.") (quoting *Illinois v. Gates,* 462 U.S. 213, 238–39, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), and *United States v. Lockett,* 674 F.2d 843, 845 (11th Cir.1982)) (alterations in original); *United States v. Betancourt,* 734 F.2d 750, 754 (11th Cir.1984) ("[P]robable cause exists 'if facts within the magistrate's knowledge and of which he had reasonably trustworthy information would warrant a man of reasonable caution in the belief that a crime was committed and that evidence is at the place to be searched.' A magistrate's decision that probable cause exists is conclusive absent arbitrariness.") (quoting *United States v. Strauss,* 678 F.2d 886, 892 (11th Cir.1982)); *United States v. Miglietta,* 507 F.Supp. 353, 357 (M.D.Fla. 1980) ("In reviewing the affidavit to ascertain whether it furnished probable cause for the warrant sought, it is given a 'common sense and realistic' interpretation. A magistrate's factual conclusions in determining probable cause are entitled to considerable deference.") (citations omitted). Examination of the sufficiency of the affi-

davits and warrants must be conducted with these deferential standards in mind.

### 1. Breadth and Particularity

 "In order for a search to be reasonable, the warrant must be specific. Specificity has two aspects: particularity and breadth. Particularity is the requirement that the warrant must clearly state what is sought. Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based." *Does I Through IV v. United States (In re Grand Jury Subpoenas Dated December 10, 1987),* 926 F.2d 847, 856–57 (9th Cir.1991) (citations omitted); *see also United States v. Weinstein,* 762 F.2d 1522, 1530–31 (11th Cir.1985) (discussing both overbreadth and lack of particularity).

Both of these aspects of specificity are challenged here. In their overbreadth argument, the Defendants contend that the warrant called for the seizure of items that were not related to the crimes for which probable cause was provided in the affidavit, and in their particularity argument they assert that the warrant's terms were so vague as to provide insufficient guidance to—and to leave improper discretion to—the searching agents.

"The scope of the warrant, and the search, is limited by the extent of the probable cause.... [P]robable cause must exist to seize all the items of a particular type described in the warrant," and "[t]hus, the concept of breadth may be defined as the requirement that there be probable cause to seize the particular thing named in the warrant." *In re Grand Jury Subpoenas,* 926 F.2d at 857 (citations omitted); *cf. United States v. Abbell,* 963 F.Supp. 1178, 1185 (S.D.Fla.1997) ("A magistrate judge's decision to issue a search warrant is necessarily guided by the information presented regarding the

specific offense which was allegedly committed. In essence, the nature of the offense is the foundation upon which the need for the search is conducted.").

The Defendants argue that the items listed in Attachment B to the Master Affidavit and the warrants amount to nearly every financial record of the entities at issue. Additionally, they particularly challenge categories 6, 7, and 8 of Attachment B; these categories, which have been quoted in full in footnote 9, *supra*, pertain to loan records, monies held in foreign accounts, and credit card records. However, the Government emphasizes that a "paper puzzle" had to be assembled to piece together the fraud and that in a case like this one documents which would be seemingly innocuous in isolation could well be revealed to constitute a small part of a large fraudulent picture when viewed in conjunction with other evidence. The Government asserts that these "records are relevant to the ownership of the businesses, and to tracing the fruits and instrumentalities of the charged crimes." (Doc. 305 at 4).

The Government is correct in noting that in complex financial fraud cases, the need to assemble a "paper puzzle" has been recognized and breadth in warrant provisions has been tolerated. *See United States v. Wuagneux*, 683 F.2d 1343, 1349 (1982). For example, in *United States v. Travers*, 233 F.3d 1327, 1330 (11th Cir. 2000), the Eleventh Circuit agreed with the characterization of the district court that the breadth issue was a "close call" where the search warrant allowed for the seizure of "all documents involving real estate, litigation, property, mailings, photographs and any other material reflecting identity, and anything reflecting potential fraud." The court noted that the case "involve[d] a complex scheme to commit financial fraud concerning real property"

and because "[a] wide variety of documents were relevant to prove this scheme ..., the agents applied for and received a warrant which cut a wide swath through [the defendant's] papers and documents." 233 F.3d at 1330.

Additionally, in *United States v. Abbell*, 963 F.Supp. 1178 (S.D.Fla.1997), the court rejected the defendants' attack regarding the nexus between the probable cause allegations and the documents as to which seizure was authorized by the warrants. The court noted that firsthand knowledge or observation of the interior of a to-be-searched office· "is desirable but not required," and stated that the fact that a warrant attachment contains an extensive listing is not sufficient by itself to render a warrant overbroad. 963 F.Supp. at 1195.

In *Andresen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), the Supreme Court had rejected the defendant's argument that the list in the warrants of documents to be seized rendered the warrant overly general, discussing the "paper puzzle" referenced in *Wuagneux*:

> Under investigation was a complex real estate scheme whose existence could be proved only by piecing together many bits of evidence. Like a jigsaw puzzle, the whole "picture" of petitioner's false-pretense scheme with respect to [the real estate lot at issue] could be shown only by placing in the proper place the many pieces of evidence that, taken singly, would show comparatively little. The complexity of an illegal scheme may not be used as a shield to avoid detection when the State has demonstrated probable cause to believe that a crime has been committed and probable cause to believe that evidence of this crime is in the suspect's possession.

427 U.S. at 480 n. 10, 96 S.Ct. 2737. Thus, at least in cases involving fraudulent schemes where the proof of guilt involves

the piecing together of seemingly innocuous documents, some breadth and generality in warrant descriptions have been tolerated.

 In the instant case, although the Defendants contend that too broad a set of records was called for in the search warrants, the Court is unpersuaded. To be sure, the warrants are broadly worded and encompass many documents. However, warrants of such breadth have been upheld, especially in white-collar crime cases involving fraud where a "paper puzzle" must be assembled "from a large number of seemingly innocuous pieces of individual evidence." *Wuagneux*, 683 F.2d at 1349. The investigation here had revealed the existence and use of four shell companies as part of a scheme to employ unauthorized aliens and evade taxes, and many documents would be relevant to such a case. The Government was, quite reasonably, interested in determining or verifying who had ownership interests in the various businesses and the sources and flow of funds among the individuals and entities involved. The specific categories about which the Defendants complain are not so far removed from the crimes alleged that they are not connected to the probable cause allegations, and they do not render the warrants unconstitutionally overbroad. And, the failure of the Government to pinpoint exactly which records would be found at each location does not invalidate the warrant; there is no way the Government could have made such predictions, and the Master Affidavit presented enough information to support a reasonable conclusion that any of the locations could have housed any of the records sought.

The parties have fiercely debated the notion of "pervasive fraud" and whether it applies in this case to justify the broad seizure of records. This dispute stems from a line of cases holding that "in cases involving a pervasive scheme to defraud, all the business records of the enterprise may properly be seized." *United States v. Sawyer*, 799 F.2d 1494, 1508 (11th Cir. 1986) (citing *United States v. Accardo*, 749 F.2d 1477 (11th Cir.1985) and *United States v. Brien*, 617 F.2d 299 (1st Cir. 1980)). The Defendants contend that because the businesses at issue here—with the exception of the four shell companies—are undisputedly involved in legitimate retail operations, not all records could be seized. The Government, however, argues that the extent of the employment of unauthorized aliens at BBW—at one 80% of the workforce was allegedly made up of unauthorized aliens—justified a broad but not wholesale seizure of records and rendered many items potentially relevant to the case. Thus, the Government does not contend that the Defendant businesses are sham businesses, but it asserts that the extent of the unlawful employment practices by the businesses justified a wide-scale seizure.

The Government has the better argument on this point. Although not "illegal" operations, the businesses that were the subject of the warrants are alleged to have employed a large number of unauthorized aliens and to have evaded a large amount of taxes by virtue of that employment. As noted above, many documents could be relevant to piecing together the whole picture, and the extent of the alleged scheme justified authorization of seizure of the described categories of items.

 Next, as to insufficient particularity, the Defendants contend that the warrants failed to provide guidance to the searching agents as to what documents could properly be seized, in essence authorizing a general seizure. However, under controlling case law, the warrants at issue pass muster in this regard because they

were limited to the crimes described in the warrants and the supporting affidavit.

In *Wuagneux*, the Eleventh Circuit examined the particularity issue in the context of a white-collar crime case. The court explained:

> [The Fourth Amendment's particularity] requirement is aimed at preventing "general, exploratory rummaging in a person's belongings." A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized. Failure to adequately enforce the particularity requirement would undermine the warrant requirement itself, and increase the risk of an excessive intrusion into the areas of personal rights protected by the Fourth Amendment.

683 F.2d at 1348–49. Although in *Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 72 L.Ed. 231 (1927), the Supreme Court had stated that "as to what is to be taken, nothing is [to be] left to the discretion of the officer executing the warrant," this assertion has often been recognized as an overstatement and a description of a standard which few warrants could meet. *See, e.g., Wuagneux*, 683 F.2d at 1349 n. 4 ("As this court and others have observed . . . if this statement [from *Marron*] were construed as a literal command, no search would be possible. Instead, our concern is whether the warrant provides sufficient guidelines and limitations to meet the test of particularity already described above.") (citations omitted); *United States v. Tranquillo*, 330 F.Supp. 871, 875 (M.D.Fla.1971) ("[T]he doctrine in *Marron* suffered from overstatement. If it were to be applied literally, there could never be a valid seizure of anything not described in a search warrant.").

■ Instead, "[i]t is universally recognized that the particularity requirement must be applied with a practical margin of flexibility, depending on the type of property to be seized, and that a description of property will be acceptable if it is as specific as the circumstances and nature of activity under investigation permit." *Wuagneux*, 683 F.2d at 1349. As noted earlier, in *Wuagneux* the Eleventh Circuit emphasized the Supreme Court's "recogni[tion] that effective investigation of complex white-collar crimes may require the assembly of a 'paper puzzle' from a large number of seemingly innocuous pieces of individual evidence." 683 F.2d at 1349 (citing *Andresen v. Maryland*, 427 U.S. 463, 481, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976)). The *Wuagneux* court thus reasoned that "in cases . . . involving complex financial transactions and widespread allegations of various types of fraud, reading the warrant with practical flexibility entails an awareness of the difficulty of piecing together the 'paper puzzle.'" 683 F.2d at 1349.

The warrants at issue in the instant case are sufficiently particular. They are limited as to time frame, as to the crimes for which the items are sought, and as to the persons and entities whose records could be seized. These limitations are sufficient to satisfy the Fourth Amendment.

The first sentence of Attachment B to the warrants states, "Items and information to be seized shall include the records, documents, and property described in Paragraph C found at the below-listed premises, for the time period 1997 to present relating to the employment and harboring of illegal aliens." (Attach. B to warrants, ¶ A). The second sentence then lists the entities and individuals at issue. (*Id.*) These sentences limit the scope of the warrant as to time, offense, and subject matter, and similar limitations through prefatory language, consideration of the totality of the warrants' terms, and refer-

ence to the supporting affidavit have been upheld. *See, e.g., United States v. Weinstein,* 762 F.2d 1522, 1531–32 & n. 4 (11th Cir.1985) (concluding that exhibit to warrant particularly described property to be seized, noting that "the nature of the case under investigation" must be considered and the supporting affidavit set forth the scope and operation of the scheme); *Wuagneux,* 683 F.2d at 1350–51 (finding all of warrant's eleven categories of items to be seized were sufficiently particular when read in conjunction with affidavit); *In re Grand Jury Subpoenas,* 926 F.2d at 857 (finding warrants sufficiently particular where they "listed a variety of documents as objects of the search ... [b]ut the list was qualified by the requirement that the document seized be 'in the name of or have reference to' [the defendant] or one of the twenty-one persons or entities that had been linked to him through the investigation"); *In re Search Warrant Dated July 4, 1977,* 572 F.2d 321, 326–27 (D.C.Cir.1977) (reversing district court's determination that warrant was impermissibly broad, finding that district court had ignored warrant's limitation to evidence of the particular crimes described in the affidavit); Agent Buechner's Master Affidavit explained the scheme and crimes under investigation, and even though that affidavit was not attached to the warrant, in this circuit such attachment is not required for successful incorporation of its terms into the warrant, at least where, as here, the affidavit was provided to the searchers. *Cf. Wuagneux,* 683 F.2d at 1350 n. 6 (finding that "the searchers were adequately informed of the limitations on the search given their instruction by [the affiant agent], their opportunity to read the affidavit, and its presence at the search site" even though "it was neither incorporated into the warrant by express reference nor attached to an accompanying warrant").

Warrants have survived particularity challenges even where they have called for the seizure of many categories of items. Although the warrants at issue here encompass many types of records, they sufficiently describe what is within their terms. *See Andresen v. Maryland,* 427 U.S. 463, 479–81, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976) (holding that the inclusion of the phrase "together with other fruits, instrumentalities and evidence of crime at this [time] unknown" did not render search warrants impermissibly general where it was "clear from the context that the term 'crime' in the warrants refer[red] only to the crime of false pretenses with respect to the sale of [one specific real estate lot]"); *Wuagneux,* 683 F.2d at 1350 n. 5 (finding, in case involving racketeering, embezzlement, mail fraud, bank fraud, and the filing of false tax returns, that search warrant was sufficiently particular; warrant provided for seizure of eleven categories of records, the last of which encompassed "property that constitutes evidence of the above-enumerated offenses, fruits of the crimes named-above and property which is or has been used to commit the crimes enumerated herein"); *see also United States v. Majors,* 196 F.3d 1206, 1216 (11th Cir.1999) (concluding that "[d]ue to the peculiar nature of a charge of fraud, especially where corporations are used as vehicles of fraud, an application to search the premises of [the corporate office] for '[b]ooks, [l]edgers, [r]eceipts, [i]nvoices, [b]usiness records, the identification of [f]inancial accounts and any other evidence which is evidence in violation of [two sections of Title 18]' describe[d] with particularity the items to be seized"); *United States v. Sawyer,* 799 F.2d 1494, 1508–09 & n. 15 (11th Cir.1986) (affirming denial of motion to suppress and finding search warrant sufficiently particular in case involving conspiracy and financial fraud; warrant authorized seizure from a

corporate office of numerous types of records, including "banking records," "personnel files," and "financial records," and the court noted that "the government here had no obligation to restrict the search to specific documents where the evidence, detailed fully in the accompanying affidavits, demonstrated widespread efforts to defraud customers through a variety of misleading disclosures and representations"); *United States v. Santarelli,* 778 F.2d 609, 613–14 (11th Cir.1985) (affirming denial of motion to suppress in case involving charges of subscription to false statements on income tax returns, finding that warrant authorizing seizure of, inter alia, "United States currency, promissory notes, life insurance policies, documents of assignment of life insurance policy proceeds" and "all property constituting evidence of the crimes of making and conspiring to make extortionate extensions of credit, financing extortionate extensions of credit, and collections of and conspiracy to collect extortionate extensions of credit" and " 'all property' constituting evidence of loansharking" was sufficiently particular) [12]; *United States v. Weinstein,* 762 F.2d 1522, 1531–32 (11th Cir.1985) (finding warrant sufficiently specific in RICO conspiracy and mail and wire fraud case despite fact that name of co-defendant was in warrant but not affidavit where warrant and its attached exhibit clearly indicated that correspondence addressed to co-defendant and two business entities was within the scope of probable cause, and finding extensive list of firms and entities whose property was to be seized passed muster because the attached warrant affidavit clarified ambiguities as to the dates at issue and the scope of the fraudulent scheme); *United States v. Blum,* 753 F.2d 999, 1001 (11th Cir.1985) (rejecting "general warrant" argument in mail fraud case where warrant authorized seizure of specific items "and miscellaneous merchandise fraudulently obtained from vendors throughout the United States . . . in violation of [three sections of Title 18]" and finding that "[t]he warrant was as specific as possible under the circumstances as to all merchandise seized"). In sum, the warrants are neither impermissibly broad nor insufficiently particular.

### 2. Computer Provisions

■ The Defendants also challenge the warrants' specificity regarding the search and seizure of computers. The Defendants contend that the warrants did not limit the scope of the computer searches and that no probable cause was given to support the conclusion that evidence of the alleged crimes would be found on computers. The Defendants assert that because of the massive amount of data that computers can store, it was highly likely that the seized computers would contain records that were not within the warrant.

In the Master Affidavit, Agent Buechner devoted 6½ of the 59 pages to the "Computer Search." (Master Aff. at 51–57). In that portion of the Master Affidavit, Buechner stated that "Big Bargain World Stores, Sports Dominator Stores, Maali Enterprises, 'the warehouse,' and Portlock's office . . . used a computer network and stand alone desktop and laptop computers," while it was "unknown whether the residence[ ] of . . . Maali . . . [was] tied to the computer 'network,' or contain[ed] stand-alone computers." (Master Aff. at 51 ¶ 82a). One of the confidential informants had advised that the "warehouse" locations contained corporate offices, including office

---

**12.** As noted in the Eleventh Circuit's opinion, this was not the exact language of the warrant, which was missing from the record, but the parties had agreed that the description in the opinion was an accurate reproduction of it. 778 F.2d at 614 n. 8.

space for Mr. Khanani and Mr. Maali, (Master Aff. at 52 ¶ 82d), and that "workers were recently employed to work in the corporate office and computerize employee files which were formerly kept on paper" (Master Aff. at 53–54 ¶ 84). Agent Buechner further states that "[t]he relevant information, which may be found on the computer hardware, may be accessed by the software programs used by the stores, offices and possibly from home computers located at the homes of the principal subjects." (Master Aff. at 52 ¶ 82e).

The Master Affidavit further states that "Bargain World, Sports Dominator, Maali Enterprises, and Portlock's computer hardware, software, related documentation, passwords, and data security devices have been used in the preparation of documents and materials in furtherance of the violations of ... law listed above." (Master Aff. at 53 ¶ 83). The computer-related items are stated to be "integral tools of this crime and constitute the means of committing it," and thus are both "instrumentalities and evidence of the violations designated." (Master Aff. at 53 ¶ 83). Agent Buechner further states in the Master Affidavit that based on his knowledge, training, and experience, and based on his consultations with the FBI Computer Analysis Response Team (CART), he knows that because of the volume of evidence that can be stored on computers, because of the possibility of attempted concealment of evidence on computers, and because information deleted from computer equipment can sometimes still be recovered through special analytical methods as computer "residue," search of computers often requires the seizure of most or all computer equipment from a site so that it can "be searched later by a qualified computer examiner in a laboratory or other controlled environment." (Master Aff. at 54–55 ¶ 85). Similarly, the same concerns render it necessary for peripheral devices, software, documentation, and data security devices to be seized for later examination by a qualified computer examiner in a laboratory or other controlled environment. (Master Aff. at 55–56 ¶ 86). The Master Affidavit provides that "[t]he government ... wish[es] to seize (or retain) the hardware defined and described [in the Master Affidavit] in order to properly search the contents of those devices." (Master Aff. at 56 ¶ 89). Attachment B to the thirteen search warrants that provide for the seizure of computer equipment states that "[a]s to the seizure of computers and computer components, the government will return the computers promptly after retrieving and storing the information contained therein, which period will not exceed ten days." (See Khanani Exs. 1–13, Attach. B).

The provisions of the Master Affidavit are sufficient to support probable cause that evidence of the alleged crimes would be found on computers at the search locations. Agent Buechner recounted information provided by an informant as to the use and presence of computers at the businesses. Additionally, surveillance and trash pulls had revealed evidence of computer usage at the businesses. And, the Master Affidavit's allegations, including the description of evidence that Mr. Maali took business records home, is sufficient, if only marginally so, to support seizure of computers at his residence.

■ Furthermore, the lack of a detailed computer "search strategy" does not render the warrant deficient as to the search and seizure of computers. Some courts have required a detailed description of the strategy to be employed in a computer search. See United States v. Hunter, 13 F.Supp.2d 574, 584 (D.Vt.1998) ("To withstand an overbreadth challenge, the search warrant itself, or materials incorporated

by reference, must have specified the purpose for which the computers were seized and delineated the limits of their subsequent search."); *see also United States v. Barbuto,* No. 2:00CR197K, 2001 WL 670930, at * 4–5 (D.Utah Apr.12, 2001) (concluding that computer search exceeded limits of the Fourth Amendment under controlling Tenth Circuit precedent and noting that search "methods or criteria should have been presented to the magistrate before the issuance of the warrants or to support the issuance of a second, more specific warrant once intermingled documents were discovered"). However, other courts have rejected arguments that a warrant must set forth the government's proposed strategy for searching computers once seized. *See United States v. Hill,* 322 F.Supp.2d 1081, 1090 (C.D.Cal.2004) (rejecting defendant's argument "that the warrant was overbroad because it did not define a 'search methodology' " and finding defendant's proposed methodology unreasonable).

The Defendants rely in part on a Department of Justice computer search manual in support of their argument that a computer search strategy should have been provided in the Master Affidavit. (Computer Crime and Intellectual Prop. Sec., Crim. Div., U.S. Dep't of Justice, "Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations" (July 2002), Khanani Ex. 28). That manual does recommend the inclusion of a search strategy in the warrant affidavit. (*See, e.g.,* Khanani Ex. 28 at 69 ("The third step in drafting a successful computer search warrant is to explain both the search strategy and the practical considerations underlying the strategy in the affidavit. . . . The affidavit should also explain what techniques the agents expect to use to search the computer for specific files that represent evidence of crime and may be intermingled with

entirely innocuous documents.")). However, the Defendants acknowledge that the manual is not authoritative. (*See, e.g.,* Khanani's Supplemental Brief, Doc. 414 at 16 n.30 ("Although Mr. Khanani in no way contends that the DOJ Guidelines are authoritative as to the constitutional requirements for the lawful search and seizure of computers and computer files, the violation of such Guidelines is evidence of the Government's failure to act in good faith.")). While it may be preferable and advisable to set forth a computer search strategy in a warrant affidavit, failure to do so does not render computer search provisions unduly broad. *Cf. United States v. Thorn,* 375 F.3d 679, 685 (8th Cir.2004) (finding that search warrant "which explicitly authorized the search and seizure of electronic storage media containing images of minors involved in sexual acts[ ] was sufficient to provide the authority to examine the contents of the various computer-related media" and that second warrant was not necessary before search of computers could be conducted).

Warrants authorizing seizure of computer equipment for later off-site search of their contents for evidence pertaining to the alleged crimes have been upheld, especially where, as here, the supporting affidavit explained the reason such off-site analysis was necessary. *See, e.g., United States v. Hay,* 231 F.3d 630, 637 (9th Cir. 2000) ("[T]he affidavit explained why it was necessary to seize the entire computer system in order to examine the electronic data for contraband. It also justified taking the entire system off site because of the time, expertise, and controlled environment required for a proper analysis."); *United States v. Upham,* 168 F.3d 532, 535 (1st Cir.1999) (noting that "[a]s a practical matter, the seizure and subsequent off-premises search of the computer and all available disks was about the narrowest

definable search and seizure reasonably likely to obtain the images" and that "[a] sufficient chance of finding some needles in the computer haystack was established by the probable-cause showing in the warrant application[,] and a search of computer and co-located disks is not inherently more intrusive than the physical search of an entire house for a weapon or drugs"); *cf. Schandl,* 947 F.2d at 465–66 (noting that "it might have been far more disruptive had the agents made a thorough search of each ... computer disc before removing it from [the defendant's] home and office"). The fact that many records other than those responsive to a search warrant are likely to be stored on computers does not render seizure of computers for offsite searching impermissible. *See, e.g., Upham,* 168 F.3d at 535; *Hunter,* 13 F.Supp.2d at 583 ("[U]ntil technology and law enforcement expertise render on-site computer records searching both possible and practical, wholesale seizures, if adequately safeguarded, must occur. At the very least, the government should copy and return the equipment as soon as possible."). The warrants at issue here did provide for prompt return of the computers.

The better practice would have been to follow the DOJ guidelines in developing a search strategy and presenting that strategy to the magistrate judge, and the failure to do so is troubling. However, the lack of a detailed offsite search strategy does not render the warrants' computer search provisions insufficiently particular, and the computer search provisions otherwise satisfy the Fourth Amendment.

### 3. The Date on the Fourteenth Warrant

■ Mr. Portlock challenges the sufficiency of the fourteenth warrant, which was issued for the search of a Shurgard

storage unit after searches of the other thirteen locations had already begun. Mr. Portlock contends that the fourteenth warrant was "defective and vague, on its face, because it fails to identify or state an issuance date any more specific than November of 2002." (Def. Portlock's Reply and Supplemental Mot. to Suppress Tangible Evidence, Doc. 306 at 2). However, there is no merit to Mr. Portlock's argument that the lack of a day of the month on the face of the fourteenth warrant renders it impermissibly vague.

The fourteenth warrant does contain an incomplete date. It is signed by the magistrate judge and states that the search was to be conducted on or before November 24, 2002, but at the bottom where there is a space for the date of issuance of the warrant the line reads only "November , 2002," with no day of the month filled in. (Government's Ex. 14). However, on the "Application and Affidavit for Search Warrant" the magistrate judge signed the jurat, "Sworn to before me, and subscribed in my presence November 14, 2002," following DEA Agent Jones's signature, and the magistrate judge also signed the jurat that provides, "Sworn and subscribed to before me this 14th day of November, 2002" on DEA Agent Jones's "Affidavit in Support of Search Warrant." (Government's Ex. 14). Moreover, the body of Jones's affidavit describes the November 14, 2002 search of Portlock's accounting office in its explanation of the reason for which the fourteenth warrant was sought, and it is undisputed that the actual search of the Shurgard unit also occurred on November 14. Logically, then, the warrant was signed in between the time the affidavit was sworn to (on November 14) and the time the search was conducted (later on November 14), and thus the warrant was also signed on November 14. Although Mr. Portlock does not assert that the date on the affidavit

(November 14) is incorrect or that the warrant was not actually issued on November 14, he nevertheless argues that the lack of a precise date renders the warrant defective.

Mr. Portlock does not cite any authority for his assertion that the lack of a complete date on the warrant renders it constitutionally infirm, nor has any been located. On the contrary, similar clerical errors and omissions have been held not to affect the validity of a search warrant. *See, e.g., United States v. Bonner,* 808 F.2d 864, 866–67 (1st Cir.1986) (finding warrant valid despite omission of address of location to be searched and referring to such as "a minor, technical omission"); *Ross v. United States,* No. CR. 496150(1)JRTAJB, Civ. 03–1020(JRT), 2003 WL 22076607, at *4 n. 4 (D.Minn. Sep. 2, 2003) (rejecting claim that warrant was invalid where, due to clerical error, warrant reflected that it was issued on August 31 but executed on August 27); *United States v. Albert,* 195 F.Supp.2d 267, 274 (D.Mass.2002) (concluding that omission from warrant of reference to list of items to be seized was merely "a clerical error that posed no real risk to legitimate privacy interests"); *cf. United States v. Berry,* 113 F.3d 121, 124 (8th Cir.1997) (reversing district court's grant of motion to suppress which had been based on warrant's failure to specifically authorize nighttime search; affidavit clearly had contemplated a nighttime search, warrant was presented for signature at issuing judge's home at 12:30 a.m., and it was thus apparent to the appellate court "that the wording of the concluding paragraph in the warrant was the result of some sort of clerical error"); *United States v. Klaia,* 127 F.2d 529, 530 (2d Cir.1942) (finding omission of date from copy of search warrant was trivial and harmless where original was properly dated).

Moreover, any such "invalidity" was cured by the searching officers' good-faith reliance on the warrant containing the clerical error. *See United States v. Russell,* 960 F.2d 421, 423–24 (5th Cir.1992) (applying good-faith exception where warrant was "defective because of clerical error" of omission of list of items to be seized, finding "nothing to be gained by laying fault for this apparent clerical error at [IRS agent's] feet"); *United States v. Curry,* 911 F.2d 72, 77–78 (8th Cir.1990) (applying good-faith exception to uphold search conducted pursuant to warrant which lacked address of premises to be searched); *Bonner,* 808 F.2d at 867 ("Even assuming that the search warrant was invalid due to the omission of the address, the evidence was properly admitted under the good faith exception to the warrant requirement."); *see also United States v. Smith,* 63 F.3d 766, 769 (8th Cir.1995) (noting, in ruling that failure of magistrate judge to sign jurat on warrant affidavit did not negate probable cause for warrant, that the exclusionary rule does not apply "to clerical mistakes by judges"). Thus, Mr. Portlock's argument that the missing date on the fourteenth warrant renders it invalid is not persuasive.

### 4. Probable Cause With Respect to Portlock Sites

■ Mr. Portlock also challenges whether there was probable cause that responsive evidence, including computers, would be located at his office and storage unit. However, the Master Affidavit and the Jones affidavit that was submitted in support of the fourteenth warrant provide sufficient probable cause for the search of those locations.

The Master Affidavit describes Mr. Portlock's role as the accountant for the subject individuals and businesses, and it also describes his connection to these enti-

ties as involving more than merely the provision of accounting services. One of Mr. Maali's tax returns had been found in the trash receptacle outside Mr. Portlock's office, and envelopes addressed to Mr. Portlock had been found at Maali Enterprises. Mr. Portlock had been BBW's representative in the Department of Labor investigation in 1998, and he had also attended business meetings. Even if Mr. Portlock were "merely" an accountant for these businesses, however, documents responsive to the warrant would likely be found at his office; documents pertaining to employee-related expenses and taxation would logically be kept by an accountant. And, although it might be a stretch to conclude that the Shurgard storage unit would hold all of the types of records listed in Exhibit B, the Jones affidavit that was submitted in support of the warrant for that site clarifies that the records that were believed to be at that site were "old client files, including those of Jesse Maali, for 1999 and earlier." (Government's Ex. 14, Jones Aff. ¶ 3). The warrant for that site is fairly limited to such by that affidavit, which provides probable cause that responsive client files would be found at the storage unit. Moreover, a 1040 had been found in the trash at Mr. Portlock's office; although the Master Affidavit did not note that it was a computer-generated 1040, this omission is not fatal. Applying a " 'common sense and realistic' interpretation" to the Master Affidavit's provisions, *United States v. Miglietta,* 507 F.Supp. 353, 357 (M.D.Fla.1980), probable cause existed to believe that Mr. Portlock used computers in his accounting business.

Mr. Portlock further argues that the statement in the Master Affidavit as to his computers being used as instrumentalities of the crimes involved in this case was recklessly made in violation of *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). In that case, the United States Supreme Court held that "where the defendant makes a preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." 438 U.S. at 155–56, 98 S.Ct. 2674. Here, however, neither has Mr. Portlock made a preliminary showing nor is the allegedly false statement necessary to probable cause for the search of Mr. Portlock's sites. The *Franks* Court noted that there is "a presumption of validity with respect to the affidavit supporting the search warrant" and held that "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required" on the recklessness issue. 438 U.S. at 171–72, 98 S.Ct. 2674. Mr. Portlock alleges that there is no factual support for the computer-use statement, but it is reasonable to conclude from the other allegations in the Master Affidavit regarding Mr. Portlock's involvement with the subject businesses that his computers were used in the scheme at issue. And, in any event, task force coordinator Stephen Thomas testified at the suppression hearing that he had observed computers in Mr. Portlock's office prior to the warrant application. (Tr. at 1067–69).[13] In sum, the magistrate judges' conclusions regarding the existence of probable cause with re-

13. The transcript of the suppression hearing consists of nine consecutively-paginated volumes. (Docs. 417–25). References to the transcript are indicated by "Tr." followed by the page number.

spect to Mr. Portlock's office and storage unit were not erroneous.

## C. Execution of the Search Warrants

The Defendants also argue that in executing the warrants the searching agents exceeded the warrants' scope and conducted a constitutionally impermissible "general search." Among other things, the Defendants contend that records of other businesses having nothing to do with the warrant were seized and that a securities business of Mr. Khanani was searched and its records seized without a warrant. Mr. Maali also challenges the seizure of his personal writings and records of his charitable contributions—items which the Government still refuses to return to him. The Defendants aver that the executing officers acted in "flagrant disregard" of the warrants and that therefore all of the evidence seized—even the evidence that was within the terms of the warrant—should be suppressed.

The Defendants contend that from the outset, the search operation was intentionally coordinated so that documents beyond the scope of the warrants would be seized. (See, e.g., Doc. 415 at 10). The Defendants complain that agents who were not familiar with the investigation were used as searchers; that the search teams were inadequately briefed and were intentionally given vague instructions so that the terms of the warrants would be exceeded; that knowledgeable task force members were not placed in positions where they could effectively ensure that what was seized was within the terms of the warrant; that searchers were assigned to specific sites "in a manner calculated to encourage the overbroad seizure of documents" (Doc. 415 at 14); and that no interpreters were included on the search team to translate or identify documents written in Arabic—one of the three languages, along with English and Spanish, that the task force knew Mr. Maali spoke. The Defendants particularly emphasize the seizure from several locations of records regarding Ponderosa restaurants—restaurants of which the task force was aware prior to the search but which were not alleged in the Master Affidavit to have been involved in the suspected crimes.

The Government, while acknowledging that evidence beyond the warrants was seized in the search, asserts that given the nature of this case the seizure of extraneous items was inevitable and that in any event the warrants were not "flagrantly disregarded" by the searchers. Thus, the issue before the Court is not whether too much was seized, but rather the scope of the remedy for such wrongful seizure.

■■■■ "[T]he magnitude of a search is insufficient, by itself, to establish a constitutional violation; rather, the relevant inquiry is whether the search and seizures were reasonable under all the circumstances." *United States v. Wuagneux*, 683 F.2d 1343, 1352 (11th Cir.1982). And, as acknowledged by the Defendants, seizure of items beyond the scope of a search warrant generally does not result in the suppression of evidence that is within the warrant's terms; instead, in most cases only seized items that are outside the warrant's terms will be suppressed. *See, e.g., United States v. Schandl*, 947 F.2d 462, 465 (11th Cir.1991) ("The seizure of items not covered by a warrant does not automatically invalidate an otherwise valid search."). However, where searching agents act in "flagrant disregard" of a warrant's terms, wholesale suppression of all seized evidence may be called for. *See, e.g., Wuagneux*, 683 F.2d at 1354 ("Total suppression may be appropriate where the executing officer's conduct exceeds any reasonable interpretation of the warrant's

provisions. Courts have consistently held, however, that absent a 'flagrant disregard' of the terms of the warrant, the seizure of items outside the scope of a warrant will not affect admissibility of items properly seized.") (citations omitted).

Thus, although numerous items outside the warrants were seized in this case, blanket suppression of all evidence seized is not appropriate unless the searchers conducted the search in "flagrant disregard" of the warrants' terms. While this standard was endorsed by the Eleventh Circuit in *Wuagneux*, the Defendants have not cited, and the Court is not aware of, any published decision within this circuit where blanket suppression has been deemed necessary. In other jurisdictions, "flagrant disregard" and attendant wholesale suppression have been found only in extraordinary cases.

For example, *United States v. Foster*, 100 F.3d 846 (10th Cir.1996), the warrant had authorized a search for marijuana and several specified guns, but DEA agents seized "thirty-five items 'including various firearms, ammunition, videotapes, marijuana, drug paraphernalia, and other miscellaneous items,'" while "state officers seized anything of value in the house," including several VCRs, a riding lawnmower, several stereos, several televisions, a machete, knives, three vehicles, and jewelry. 100 F.3d at 848 & n. 1 (quoting district court order). At the *Foster* suppression hearing, a deputy sheriff "admitted that the officers had simply seized anything of value in [the defendant's] house" and "that this was the standard practice in [the] county," the purpose of which was "an effort to turn up evidence of additional crimes." 100 F.3d at 850–51. The Tenth Circuit court stated:

> [T]he extreme remedy of blanket suppression should only be imposed in the most "extraordinary" of cases. This

case is one of those exceedingly rare cases. It is for that reason that the dearth of appellate cases authorizing blanket suppression is neither surprising nor revealing. Given the testimony and conduct of the state officers in this case, the district court stated that it could not "imagine a more pronounced case of a search warrant execution conducted in flagrant disregard for its terms." In light of the particularly disturbing testimony ... that it is standard procedure in [the county] to ignore the particularity requirement of search warrants and to seize anything of value, we agree with the district court's assessment.

100 F.3d at 851–52 (citations and footnotes omitted).

In another Tenth Circuit case, *United States v. Medlin*, 842 F.2d 1194 (10th Cir. 1988), the court affirmed the suppression of all seized evidence where the warrant had authorized seizure only of firearms and records of the purchase or sale of those firearms. While ATF agents searched the subject residence for firearm-related evidence, a deputy sheriff had "combed [the defendant's] residence for suspected stolen property which he believed to be evidence of state offenses" and seized 667 items that were not identified in the warrant; 130 firearms had been seized by the ATF agents. 842 F.2d at 1195–96.

And, in *United States v. Rettig*, 589 F.2d 418 (9th Cir.1978), the Ninth Circuit concluded that all seized evidence should have been suppressed. There, the defendants were convicted of conspiracy to import cocaine and to possess cocaine with intent to distribute it. DEA agents had sought an arrest warrant and search warrant from a federal magistrate judge, but the magistrate judge issued only the arrest warrant because the information on which the search warrant request was based was deemed stale. The next day, agents en-

tered a defendant's house and found him attempting to flush marijuana down the toilet. The suspect was taken into custody and some agents remained at the house while others made another attempt to get a search warrant, this time from a state court judge.

The affidavit that was presented to the state court judge in *Rettig* stated that the agents sought evidence supporting a marijuana-possession charge, and the affidavit failed to mention the federal magistrate judge's denial of the search warrant request the previous day or any intention of seeking cocaine-conspiracy evidence. The state court judge issued a search warrant for the residence which provided for seizure of marijuana-related items and evidence regarding the identity of the residents of the house. The agents immediately returned to the residence and searched it, retrieving 2,288 items, most of which consisted of written material. Faced with these facts, the Ninth Circuit concluded that the warrant "was used as an instrument for conducting the search for which permission had been denied on the previous day, a search that pertained to evidence of the cocaine charge, not to the possession of marijuana." 589 F.2d at 421. The court thus found that the warrant "became an instrument for conducting a general search" and that all of the seized evidence should have been suppressed. 589 F.2d at 423.

In other cases, however, courts have found that the manner in which the search was conducted did not amount to flagrant disregard. For example, in *Wuagneux*, the Eleventh Circuit rejected the defendant's argument that because a large proportion of the seized documents were outside the warrant, all evidence should be suppressed even though those documents were not introduced against him. That case involved racketeering, embezzlement,

mail fraud, bank fraud, and the filing of false tax returns, and the search warrant provided for the seizure of eleven categories of records. Approximately a dozen agents were involved in the *Wuagneux* search, and the investigation, affidavit, and warrant were explained to them at a briefing on the morning of the search. During the search, two searchers familiar with the investigation circulated around the search premises to review the documents that the other agents identified for removal; if a document was determined not to be within the warrant, it was returned. Between 50,000 and 100,000 documents were seized. The *Wuagneux* court found that "the search was performed in a manner intended to minimize the intrusiveness of the search under the circumstances" and that there were "no grounds that would have justified the total suppression of fruits of the search, even assuming that a number of documents seized but not introduced were outside the scope of the warrant." 683 F.2d at 1354.

In *United States v. Schandl*, 947 F.2d 462 (11th Cir.1991), the Eleventh Circuit affirmed the district court's denial of a motion to suppress in a tax evasion case. There, the search warrant had provided for the seizure of "[a]ll books, documents, receipts, notes, journals, contracts, agreements, ledgers or other records including originals of all information stored on computer magnetic tapes, computer discs, and/or any other computer memory storage devices, plus computer mainframe which operates the memory storage devices relating to any financial transactions of [the individual defendant· and several businesses], which are fruits, evidence, or instrumentalities of criminal offenses against the United States namely, attempts to evade or defeat Federal income taxes and failure to file." 947 F.2d at 465. In addition to seizing evidence within the warrant, the IRS Special Agents who

searched the defendant's home and office had "leafed through [the defendant's] personal love letters, seized documents concerning his son's rhinoplasty, a computer disc containing a bible home study course, a rolodex, a box of letters from his mother and father, tax protester manuals and other personal items." 947 F.2d at 464.

The Eleventh Circuit in *Schandl* affirmed the denial of the motion to suppress, noting:

> The seizure of items not covered by a warrant does not automatically invalidate an otherwise valid search. "This is especially true where the extra-warrant items were not received into evidence against the defendant." The crucial inquiry is always "whether the search and seizures were reasonable under all the circumstances." Such things as the scope of the warrant, the behavior of the searching agents, the conditions under which the search was conducted, and the nature of the evidence being sought must be considered in determining whether or not the search was reasonable.

947 F.2d at 465 (citations omitted). In a footnote, the court mentioned that "[t]en agents were needed to conduct the search which took a full day." 947 F.2d at 465 n. 3. The court thus rejected the defendant's argument that the agents had gone "on a 'malicious' voyeuristic, and self-indulgent rummaging"' when they "read love letters and seized personal documents, some of which were not relevant." 947 F.2d at 465. *See also United States v. Santarelli,* 778 F.2d 609, 615–16 (11th Cir.1985) (finding no flagrant disregard where agents seized documents including Disney World tickets and children's report cards and took documents offsite for closer examination, noting that such offsite inspection was less intrusive than review of documents at the home would have been where brief examination of documents on site would have taken several days); *United States v. Heldt,* 668 F.2d 1238, 1269 (D.C.Cir.1981) (concluding that government's actions did not amount to flagrant disregard where issues raised by defendants included inadequate preparation of dozens of searching agents, violation of limitations on areas to be searched, and seizure of documents beyond scope of warrant, and noting that "a good faith attempt to stay within the boundaries of an inherently broad warrant will support a finding that the search— taken as a whole—was reasonable, even though a majority of documents seized might turn out not to qualify for inclusion on more leisurely reflection"); *United States v. Hunter,* 13 F.Supp.2d 574, 585 (D.Vt.1998) (finding that presence of DEA agents at search, in violation of express terms of search instructions appended to the warrant, did not amount to flagrant disregard where agents did not play substantial role in search for or review of documents and did not otherwise participate to extent necessary for finding of flagrant disregard).

 Given the nature and scope of the instant case, seizure of some documents beyond the terms of the warrant was virtually inevitable, and this inevitability has been recognized and tolerated in other large-scale financial fraud cases. *See, e.g., United States v. Schandl,* 947 F.2d 462, 465 (11th Cir.1991) ("It was inevitable that some irrelevant materials would be seized as agents searched through numerous documents for evidence of tax evasion and failure to file, crimes that are generally only detected through the careful analysis and synthesis of a large number of documents."). Additionally, several of the searching agents testified at the suppression hearing regarding their attempts to minimize disruption of the ongoing businesses—a concern that has been recognized as legitimate. *See, e.g., Schandl,* 947

F.2d at 465–66 ("Indeed, it might have been far more disruptive had the agents made a thorough search of each individual document and computer disc before removing it from [the defendant's] home and office. To insist on such a practice " 'would substantially increase the time required to conduct the search, thereby aggravating the intrusiveness of the search.' " ") (quoting *Wuagneux*, 683 F.2d at 1353 (quoting *United States v. Beusch*, 596 F.2d 871, 876–77 (9th Cir.1979))). Thus, any finding of flagrant disregard in this case must be founded upon something other than the sheer volume of documents seized or the fact that some items outside the scope of the warrants were taken. The most troubling seizures at issue here are of personal items—including, among others, the taking of a store manager's photographs of his mother and children from the wall of his office.

The Court has reviewed the evidence and testimony submitted at the hearing on the motions to suppress and is unable to endorse the Defendants' theory as to the Government's alleged deliberate scheme to achieve an unduly expansive search through intentionally vague instructions to the search teams or purposefully miscalculated assignments of particular agents to particular sites. As noted earlier, the execution of these search warrants involved approximately 200 law enforcement officers from several agencies, most of whom had not been involved in the task force investigation prior to the search and the preparations therefor. The searchers were briefed prior to the search and were provided with the warrant and Master Affidavit to review.

Although it is apparent from the testimony at the evidentiary hearing that the searching agents did not have a consistent understanding of what the warrants covered, this fact is not sufficient to support a finding of flagrant disregard by the searchers as a whole. The Government did take steps to ensure compliance with the warrants' terms, including informing the searching agents that they could and should contact the task force leader or the U.S. Attorney if questions arose during the conduct of the search; several such calls were in fact made. Although no "taint team" was set up and fewer protective measures were taken here than in *Wuagneux* or *Heldt*, the failure to implement additional procedures does not render the overall search deficient. In other words, that some searchers did not fully comprehend their task does not mean that the instructions and preparations were *per se* deficient or that the search was *per se* unreasonable. *Cf. United States v. Abbell*, 963 F.Supp. 1178, 1198 (S.D.Fla.1997) ("However, even if there were agents present during the search who were neither briefed nor had an opportunity to review the warrant and affidavit, this would not invalidate the search.") (citing *Heldt* ).

Additionally, although the Defendants contend that there was a "wholesale seizure of all business records," they contradictorily also argue that the fact that many documents were left behind is irrelevant. It is undisputed that many records were seized, but the evidence at the hearing also established that more records were left behind than were seized. (*See, e.g.*, Tr. at 276–77 (Test. of Jonathan White); Tr. at 433 (Test. of Margaret Weiss); Tr. at 863 (Test. of Mark German)). The agents did not merely seize anything and everything they came across, and the Defendants are incorrect that the volume of documents left behind is irrelevant; it instead shows that a wholesale seizure did not occur.

Absent "flagrant disregard" in the planning of the searches as a whole, because there was a separate warrant for each location, the sites are appropriately ana-

lyzed separately as to the conduct of each search team and whether it amounted to "flagrant disregard" as to that particular site. The seizures that occurred at search sites as to which the Defendants have taken particular exception [14] will now be addressed.

### 1. BBW Store and Office at 6454 International Drive (BBW # 1)

The Defendants contend that flagrant disregard of the terms of the search warrants occurred at the BBW store and office at 6454 International Drive. In particular, the Defendants make much of the seizure of items from an area which they claim was a separate office at 6458 International Drive which was searched under the auspices of the warrant for the 6454 site. The Defendants contend that that area was a separate office of a separate business which was searched without a warrant. The Government, however, maintains that the office was not a separate location but instead was part of the BBW store and office at 6454 International Drive for which there was a warrant

It is undisputed that the "6458 location" is adjacent to and in fact connected to the Big Bargain World store at 6454 International Drive.[15] However, the parties dispute whether the spaces are "separate" locations. Defendants contend that the area is clearly a separate business from the Big Bargain World store at 6454 International Drive, with a separate address, 6458 International Drive.

The business that operated in that space, which has gone through several name changes [16] but which at the time of the search was known as "Point Direx," is a securities-related business in which Defendant M. Saleem Khanani and his son, Owais Khanani are involved. The business had moved from the SunTrust building on Orange Avenue in downtown Orlando sometime during the latter half of 2002, but the testimony at the evidentiary hearing as to when it moved was inconsistent. For example, one employee of the business at first testified that the business had moved there in September 2002 but later referred to the time of the move as November 2002. (Tr. at 1424, 1440 (Test. of Fazal Mirza)). The Defendants contend that the task force was aware of the move (and consequently, of the presence of this business at the site) or should have been so aware, and they point out that the post office had been advised of the move. (*See, e.g.*, Khanani Ex. 44 (piece of Point Direx mail bearing Post Office forwarding sticker dated 10/29/02)). The Defendants also argue that even if the task force was not aware of the move prior to entering the building, the search team for 6454 International Drive should have immediately recognized upon entry into that area that it was a separate business unrelated to Big Bargain World. The Defendants point out that the computer and telephone equipment in that space, which included massive servers and lines for direct data streams to stock exchanges, was obviously not related to or needed by a retail operation like Big Bargain World.

However, the hearing testimony also established that there was not a separate

---

**14.** Of course, the Court acknowledges that the Defendants contend that the volume of items taken and the overall manner in which the searches were conducted should result in the suppression of all evidence from all of the sites. As noted in the text, the Court rejects this contention.

**15.** Also within the same contiguous building is a Sports Dominator store, 6464 International Drive, which was one of the other search sites for which there was a warrant.

**16.** Apparently the current name of the business is "Xoom Trade."

address number indicated outside or inside the building, nor was there any type of sign indicating that the site was the office of Point Direx. Additionally, the space is connected to the Big Bargain World Store, and Point Direx employees shared restrooms with Big Bargain World employees. Moreover, stairs in the space led up to a storage area where Big Bargain World merchandise and records were kept. And, although the Post Office apparently had been notified of the move (*see* Khanani Ex. 44), the National Association of Securities Dealers was still sending mail to Point Direx's old address as late as February 2003—three months after the search (Khanani Ex. 43 (piece of mail from NASD to Point Direx bearing forwarding sticker dated 02/25/03)). In any event, it is clear that the business had not been at the location very long before the search warrants were issued.

The evidence does not establish that the task force should have been aware of the presence of Point Direx in the building prior to the searchers' entry into the office area. However, once the searchers observed that office, the T–1 data lines, and the massive computer servers, they were put on notice that there was obviously a separate business operating there that was independent of the retail operation conducted by BBW at the front of the 6454 building. *Cf. United States v. Heldt*, 668 F.2d 1238, 1262–65 (D.C.Cir.1981) (affirming district court's conclusion that search of "hut" did not exceed terms of warrant which authorized the search of an office suite where hut was visible across terrace of office's roof, hut was accessible through French doors in the office, those who worked in the hut used the office's restroom, and hut was unmarked, with "nothing to indicate that it did not constitute part of the [office] suite").

Nevertheless, there were also offices in the same area, including the office of Defendant Khanani's son, Owais Khanani, and in which Defendant M. Saleem Khanani had been seen by Point Direx employee. (Tr. at 1189–90 (Test. of Syed Osman Ahmed)). There was also testimony that Mr. Maali and Mr. Khanani both had offices in that back area. (Tr. at 1304–05 (Test. of Terry Quinn)). It is undisputed that Point Direx items were not within the scope of the warrant, and to the extent Point Direx items were taken the Government concedes they were taken in error. Although it appears that many Point Direx records were seized, it also appears that at least some of these documents were in the same room at the site as records which were responsive to the warrant. (*See, e.g.,* Draft Search Inventory, Khanani Ex. 16). And, it is clear that efforts were made not to seize Point Direx documents and computers, although these efforts obviously were not completely successful.

In sum, flagrant disregard of the warrants' terms has not been shown as to the 6454 International Drive location. The Point Direx documents should not have been taken, but given the lack of a clear separation between the spaces and the sharing of some common areas—including an accessible storage area—by the businesses, confusion regarding what items were the property of Point Direx and which were not is understandable. Moreover, the Court has also considered the Defendants' arguments regarding the seizure of other items beyond the warrants' scope from the 6454 search location, but the Court concludes that the searchers' conduct did not cross the "flagrant disregard" threshold at this site. The appropriate remedy is the suppression and return of the Point Direx items and other non-responsive records rather than the wholesale suppression of all items taken from 6454.

### 2. Portlock's Office

Mr. Portlock also contends that flagrant disregard was evidenced by the search of his accounting office, from which 5–8 [17] boxes of materials were removed, most of which have been returned as beyond the warrants' scope. Mr. Portlock contends that the seizure of "Mona" records, which pertain to Portlock's ownership interest in a Ponderosa restaurant, were wrongfully seized despite the protests of his wife, who was present at the scene at the time of the search and who testified at the hearing that she asked the searching agents why they were seizing records that were not within the terms of the warrant.

Three witnesses who were present during the search of this site testified at the evidentiary hearing: Margaret Weiss, a special agent with the IRS criminal investigation division ("CID"); the site team leader, FBI Agent Michael Anderson; and Mrs. Portlock. According to Agent Weiss, the searching agents did not take any files from Portlock's office that were clearly related to other clients of Mr. Portlock, and no entire file cabinets were seized from that site. (Tr. at 389, 392). Weiss explained that they had to look throughout the office for items responsive to the warrant, but they seized relatively little in comparison to the total volume of records that were there. (Tr. at 433). During the search of Portlock's office, agents inquired as to whether Ponderosa records should be taken. (Tr. at 435). After Weiss conferred with FBI Special Agent Quinn about the issue, she told the searching agents that the Ponderosa records were not covered and that therefore they were not to take Ponderosa records. (Tr. at 435, 446, 460). To the extent Ponderosa records were seized from any search locations, Weiss does not know the reason for their seizure, and she did not learn until after the search that Ponderosa records had been seized from other locations. (Tr. at 439, 446, 461). Weiss recalled that Mrs. Portlock said something to another agent during the search about certain records not relating to the warrant. (Tr. at 407).

Agent Anderson did not recall searchers asking him during the search for permission to seize a folder marked "Ponderosa d/b/a Mona d/b/a Maali Restaurants," and he did not know who seized a Maali Ponderosa box out of a file cabinet. (Tr. at 1383–85). Anderson did not recall Mrs. Portlock asking about the seizure of Ponderosa records. (Tr. at 1389). Anderson also acknowledged that other items outside the scope of the warrant were taken, including records of "Bara Universal" and "Bara Vineland." (Tr. at 1407). Neither Anderson nor Weiss attempted to look through every document at the site to ensure its responsiveness to the warrant before removing documents from the site. (Tr. at 392, 454, 1385, 1409). According to Anderson, eight boxes of documents were seized from Portlock's office but far more than that were left behind. (Tr. at 1404).

Mrs. Portlock testified that she arrived at the office on the day of the search after the search was already underway. (Tr. at 1410–12). Mrs. Portlock noticed that "Mona Enterprises" files were in the boxes that the agents were seizing, and, having read the search warrant, she asked Agent Anderson why they were taking those records but got no answer. (Tr. at 1413–15). However, on cross-examination, Mrs. Portlock acknowledged that it was "certainly possible" that Agent Anderson did not hear her ask him that. (Tr. at 1421).

Considering the testimony regarding the search of Mr. Portlock's office, flagrant

---

17. Estimates of the exact number of boxes seized from this site varied in the testimony.

disregard for the warrant's terms was not displayed at that site. Although some records, including Ponderosa records, were wrongfully seized from that site, the Court credits the agents' testimony that agents were instructed not to, and made efforts not to, seize those records. The seizure of these and other documents outside the scope of the warrant from that site does not warrant suppression of everything seized from the office.

### 3. The Shurgard Storage Unit

Mr. Portlock also asserts that materials were improperly seized from his Shurgard storage unit—the site that was the subject of the fourteenth warrant. Defendant points out that from that site, records dating back to the 1980s were seized, even though the Master Affidavit had limited the time frame to 1997–2002.

The additional affidavit that was submitted by DEA Agent Timothy Jones in support of the fourteenth warrant states that agents had "learned that old client files, including those of Jesse Maali, for 1999 and earlier, are being stored at" the Shurgard unit. (Government's Ex. 14, Jones Aff. at 2). The inventory of what was seized from that unit reflects that four boxes were seized; boxes 1 and 4 are not responsive to the warrant (either because the documents were too old or they pertain to unrelated businesses), but boxes 2 and 3 are listed as pertaining of Maali and Khanani's taxes, respectively. (Government's Ex. 14). A notation on that inventory reflects that boxes 2 and 3 have been retained. Some boxes have been returned to Mr. Portlock, however. (Tr. at 1063 (Test. of Agent Thomas)).

Mr. Portlock complains that the records that were taken from the storage unit are outside the time frame set forth in the Master Affidavit—1997 to 2002. The Maali records seized in box 2 are noted to be for the years 1988–1997 (see Government's Ex. 14)—mostly beyond the time scope, although 1997 is within the time limit of the Master Affidavit. No date is listed in the inventory for the Khanani files.

No flagrant disregard has been shown as to the Shurgard storage unit. The Jones affidavit states that records prior to 1999 were reportedly stored there, and Attachment B to the warrant limited the scope to 1997 forward; dated from 1997 to 1999 would be within the terms of the warrants. Some records beyond the scope of the warrant were taken from that location, but this circumstance alone is insufficient to warrant blanket suppression at this site, and no other aggravating factors as to this site have been identified.

### 4. Maali Enterprises Office

The team leader for the search of the Maali Enterprises office was DEA Agent Jonathan White, who had not had prior involvement in the investigation until the pre-search briefings. (Tr. at 219–20). White was told during the pre-search briefings that the Maali Enterprises site would be a business office with a number of documents and a handful of employees, and White read the Master Affidavit prior to entering the site. (Tr. at 224, 227).

When the searchers arrived at the Maali Enterprises office, they determined that there was a massive number of documents there and that documents responsive to the search warrant were commingled with nonresponsive documents. (Tr. at 228). Once White realized the volume of documents that they were faced with at that site, he telephoned the task force coordinator, Stephen Thomas of the FBI, and Thomas came to the site for a brief time to help out. (Tr. at 230). The agents were concerned that they would be in the office for days looking through all of the documents, and Thomas told them to do the

best they could to seize documents that they felt were within the warrant. (Tr. at 232).

According to Agent White, the boxes of documents at Maali Enterprises were not labeled on the outside by type of business, type of record, or in any other manner. (Tr. at 232). The boxes of documents contained flip tabs, some of which were marked with names of businesses while others were not. (Tr. at 232). The office did not have a consistent organizational method. (Tr. at 232). The searching agents sorted some commingled documents on the site where it was possible to do so, but in some instances the files were difficult to sort and they wanted to protect the integrity of the files without disturbing them more than was necessary. (Tr. at 241).

Agent White did not recall Ponderosa being mentioned in the Master Affidavit. (Tr. at 235). White believed that if he saw a record that had the name of a business listed on Attachment B on it, then White could seize it. (Tr. at 240–41). Some Arabic documents were seized that day; the agents at the scene were unable to determine the nature of those documents. (Tr. at 246). There was not anyone at the scene who could translate Arabic documents, and they needed to be taken elsewhere so that they could be understood. (Tr. at 278–79). Although "Dunkin Donuts" was not listed in the Master Affidavit, invoices for a Dunkin Donuts sign were seized from that site. (Tr. at 246). However, White also testified that the agents left behind more documents than they seized at the site, and some of the documents that were left behind were Ponderosa records and Dunkin Donuts records. (Tr. at 276–77).

The Draft Inventory list which was prepared after the search and seizure occurred reflects that many boxes of documents were taken from the Maali Enterprises office. (*See* Khanani Ex. 16). Agent Thomas, the task force coordinator, acknowledged that a number of boxes of Ponderosa records were seized from this site, including some boxes containing nothing but Ponderosa records. (Tr. at 1163–64). Other boxes seized from this location contained nothing but records from other unrelated businesses, including Oasis Lodging. (Tr. at 1164).

The seizure of items from the Maali Enterprises site was quite broad. A very large number of boxes of documents were seized from this location, many of which were ultimately determined not to be responsive to the warrant. And, although Agent White testified that the boxes at the site were not labeled, the Court has been provided with two boxes from this site that apparently were labeled "Ponderosa." The Court does not mean to suggest that Agent White was not being truthful; however, apparently at a minimum there were labeled boxes of which he was not aware.

In sum, however, the Court does not attribute the overbroad seizure from Maali Enterprises to flagrant disregard. Efforts were made—including the summoning of Agent Thomas to the scene once the agents realized the daunting search task that faced them at this location—to limit the search to the confines of the search warrant. Although a number of documents pertaining to other businesses were seized here, it appears that the lack of organization and the presence of files from so many different entities at this site rendered the job of this search team especially arduous. And, attempts to preserve the integrity of files have been recognized as valid reasons to seize files or folders intact even if extraneous documents would likely thereby be seized. *See, e.g., Wuagneux*, 683 F.2d at 1353 ("It was also reasonable for the agents to remove intact files, books and

folders when a particular document within the file was identified as falling within the scope of the warrant. To require otherwise 'would substantially increase the time required to conduct the search, thereby aggravating the intrusiveness of the search.' ") (quoting *United States v. Beusch*, 596 F.2d 871, 876–77 (9th Cir. 1979)). The agents could have done a better job of sorting items on the site, but their failure to do so does not amount to flagrant disregard. *Cf. Hunter*, 13 F.Supp.2d at 585 ("Agents sorted through many files at the office in search of those within the warrant's scope. If items outside the scope of the warrant were seized, the remedy is exclusion of those items as evidence at trial. The propriety of the search or the evidence obtained therefrom remains unaffected, however, absent flagrant disregard."). Thus, while nonresponsive documents will be suppressed, full suppression of evidence from this site is not called for.

### 5. 5858 Lakehurst Drive—BBW Warehouse

Many documents were seized from the BBW Warehouse location at 5858 Lakehurst Drive. (*See* Khanani Ex. 16). Review of the Draft Search inventory reflects that while records of businesses outside the scope of the warrant were seized from that location; documents regarding many, if not all, of the businesses that were the subject of the warrants were also found at the site. (*See* Khanani Ex. 16). Given the volume of items that the searchers obviously encountered at that location, absent evidence of egregious conduct in the conduct of the search there the Court is unable to conclude that flagrant disregard of the warrants occurred at this site; the volume of items seized is not enough to support such a finding.

### 6. BBW Store at 5781 Irlo Bronson Highway (BBW # 11)

Based on a review of the draft search inventory, the records that were taken from this location appear to be almost completely responsive to the warrant and include employee schedules, time cards, and sales receipts. (Khanani Ex. 16). However, at the evidentiary hearing the manager of this store location, Issam Abdal Hack, testified that three personal photographs of his mother and his children were taken off the wall by the searching agents despite his protests. (Tr. at 1212–13). The Assistant U.S. Attorney prosecuting this case stated at the suppression hearing that she was not aware of these photographs having been taken; this is perhaps due to the fact that these items are not listed on the search inventory for the site. (*See* Khanani Ex. 16). Since Mr. Hack's testimony regarding the seizure of his photographs, it has been reported to the Court that the photographs have been returned.

One of the agents sent to the this location, FHP officer Jeffrey Cowart, also briefly testified at the suppression hearing regarding the search of this site. (Tr. at 480–496). Cowart did not prepare the evidence recovery log, and he did not recall anyone removing personal belongings from the site. (Tr. at 488–89). However, the Court credits Mr. Hack's testimony regarding the seizure of his photographs, the veracity of which is apparently borne out by the reported return of these items since the evidentiary hearing.

The seizure of Mr. Hack's personal photographs is very troubling to the Court. No explanation has been given for the taking of these personal photographs from the office wall, While the seizure of these items borders on flagrant disregard, the Court finds that it falls short of the stringent standard in this circuit on this issue.

*See, e.g., Schandl,* 947 F.2d at 464–65 (no flagrant disregard where agents read defendant's love letters and seized documents regarding son's rhinoplasty); *Santarelli,* 778 F.2d at 615–16 (no flagrant disregard where items seized included children's report cards and Disney World tickets). Thus, blanket suppression at this site is not warranted.

### 7. Maali Residence

Finally, the issue of flagrant disregard must also be addressed with respect to the search of Mr. Maali's residence. The search inventory reflects that many irrelevant items were taken from this site, and the Defendants argue that no effort was made to separate personal documents from business records during the search of this location. Mr. Maali emphasizes the seizure of his passports and those of his family members, as well as the seizure of Mr. Maali's personal writings, some of which were written in Arabic. Although the overreaching of the agents at this site makes this issue a close call, the Court is unable to find that the terms of the warrant were flagrantly disregarded here.

The suppression hearing testimony of the agents who participated in the search of this site reflected that the agents could not explain why certain items, including luggage tags and passports, had been seized. (Tr. at 769, 774, 788 (Test. of Mary Ellen Denning); Tr. at 844–45 (Test. of Mark German)). As to Arabic-language documents, Agent Mark German testified that some such documents were seized for later translation but that the location and appearance of them determined whether they were seized; documents that appeared to contain financial-type writing were seized. (Tr. at 861–62). Although an agent of Middle Eastern descent, Rana Saoud, was part of the search team at the house, testimony regarding whether Ms. Saoud spoke Arabic varied. Agent Denning thought that she did, whereas Agent German was not aware of whether she did not or did not. (Tr. at 754 (Test. of Agent Denning); Tr. at 860–61 (Test. of German)). In any event, Agent Saoud was not assigned to that site based on her ability to speak Arabic.

German described a first-floor office in the residence as messy and disorganized. (Tr. at 860). There were papers on the floor, in chairs, and throughout that office. (Tr. at 860). The agents did not seize all of the business records in the house, and in fact more documents were left in the first floor office than were taken. (Tr. at 863). German did not look in every bag before the bags were sealed up and removed from the residence, (Tr. at 866), nor did Denning (Tr. at 782).

Like the seizure of Mr. Hack's personal photographs from the wall of his office discussed above, the seizures and conduct of the search at Mr. Maali's residence come close to amounting to flagrant disregard but fall short under this circuit's controlling case law. *See Schandl,* 947 F.2d at 464–65; *Santarelli,* 778 at 615–16. The evidence does not support a conclusion that agents made a wholesale seizure of items from the residence or that they did they randomly seized anything of value. Thus, the conduct of the search at the house was not as egregious as the conduct in which flagrant disregard has been found to have been displayed. *See, e.g., Foster,* 100 F.3d at 850–52 (finding flagrant disregard where county policy was to seize anything of value in home); *Rettig,* 589 F.2d at 421–23 (flagrant disregard where agents obtained warrant from state court judge the day after being denied one by a federal magistrate judge, and agents then seized 2,288 items, mostly written, while warrant had provided for seizure of marijuana-related items). Wholesale suppres-

sion of evidence seized from the residence is not appropriate.

### 8. Summary as to Documentary Suppression Rulings

As discussed above, the Defendants have not established flagrant disregard of the terms of the warrants as to any of the search sites, although the last two sites discussed are a close call on this issue. Thus, blanket suppression of all seized evidence will not be ordered as to any site, and only those items that are not within the terms of the warrants shall be suppressed.

Because the Defendants have largely couched their suppression motions in terms of blanket suppression of all evidence rather than making discrete arguments as to the responsiveness to the warrants of specific seized items, it is not possible for the Court to delineate at this time which of the many seized items are outside the scope. However, the Government has conceded that many seized items are beyond the warrants' terms and reports that it does not intend to introduce any items beyond the scope into evidence at trial. (*See* Tr. of 05/20/04 Oral Argument, Doc. 565 at 116). To the extent that there is remaining disagreement as to which items are within the terms of the warrant and may be introduced at trial, such disputes will be addressed at the next status conference, which has been noticed by separate order. However, the Court will briefly address two points of contention—foreign-language documents and pre–1997 records.

██ The Defendants challenge the propriety of the seizure of documents that were written in Arabic. It is undisputed that documents written in Arabic were seized for later translation because the searchers could not tell whether they were within the scope of the warrants. The

Defendants contend that it was not reasonable for the searchers not to have brought someone to the sites who spoke Arabic and could translate Arabic documents because the task force was well aware that Mr. Maali spoke Arabic.

However, it was not per se unreasonable or unconstitutional for the searchers to seize Arabic language documents for off-site translation, at least where those documents were found with other, responsive documents and appeared to possibly be financial records or otherwise within the warrant. In a recent decision, a federal district court in California commented:

As always under the Fourth Amendment, the standard is reasonableness. To take an extreme example, if police have probable cause to seize business records, the warrant could not authorize seizure of every piece of paper on the premises on the theory that the police conducting the search might not know how to read. The matter becomes more difficult if the police have cause to believe the records are not in English. Are the police required to bring with them at least one officer who can read the language of the documents and separate those that provide evidence of criminal activity from those that don't? The answer might turn on how readily the police can find an officer who is fluent in that language. In Los Angeles today, finding an officer who reads Spanish may be fairly easy, while finding one who can read Portuguese or Russian probably is not. Police are certainly not required to hire an expert translator to bring with them; they are entitled to limit the search team to officers already employed and reasonably available at the time the search is to be conducted.

*United States v. Hill,* 322 F.Supp.2d 1081, 1088 (C.D.Cal.2004); *see also United States v. Frank,* 864 F.2d 992, 1005

(3d Cir.1988) (rejecting, in case involving charge of interstate flight to avoid prosecution, defendant's argument that detective had no probable cause to seize Spanish-language document for later translation where "[w]ithout translation, ... the document indicates on its face that it originated in the Dominican Republic, and it was found together with navigational aids"); cf. Commonwealth v. Copenhefer, 526 Pa. 555, 587 A.2d 1353, 1356 (1991) (noting, in discussion of offsite computer analysis, that seemingly blank paper tablets may be seized and analyzed for content, as can diaries written in private code, and "the diarist's obvious attempt to achieve secrecy does not create a legally protected expectation of privacy nor the need to obtain a warrant before subjecting legally seized physical evidence to scientific testing and analysis to make it divulge its secrets"), abrogated on other grounds by Commonwealth v. Rizzuto, 566 Pa. 40, 777 A.2d 1069 (2001); State v. Petrone, 161 Wis.2d 530, 468 N.W.2d 676, 681 (1991) (upholding seizure of undeveloped film and offsite development thereof in pornography case, noting that "[l]aw enforcement officers may employ various methods to examine objects lawfully seized in the execution of a warrant" and likening film development to laboratory analysis of blood stains or viewing of documents with magnifying glass).

Here, arguably the searchers should have anticipated that they might come across some documents written in Arabic at one or more of the search sites. They knew that Mr. Maali speaks Arabic in addition to English and Spanish. However, Mr. Khanani does not speak Arabic, although he speaks Urdu and English. Apparently the only common language of these business partners—who are at the heart of this case—is English.

According to the testimony at the evidentiary hearing, only one of the approximately 200 officers executing the search warrants spoke Arabic—Agent Rana Saoud of the United States Customs Service, who was assigned to the search team at the Maali residence—and not all of the agents even at that site were aware that Agent Saoud spoke Arabic. In any event, she was not sent there because of her language ability.

Agent Thomas testified that no Arabic-speaking translators were requested to go to any sites on the day of the searches and that none were available that day anywhere in the country. (Tr. at 994). Although the Court finds it hard to believe this testimony that no translators were available in the entire country, the Court does not find that the task force was required to send a translator to all fourteen sites or to any particular site.

Foreign-language documents that appeared to be financial records could appropriately be seized for later inspection to verify their responsiveness to the warrants. On the other hand, foreign-language documents that were not found with other responsive documents or that did not appear to be financial documents should not have been seized. The return of foreign-language documents will be addressed below.

The Defendants also challenge the seizure of documents outside the time frame provided for in the search warrants. Attachment B to the search warrants provided for the seizure of "records, documents, and property ... for the time period 1997 to present." The Defendants contend that items that preceded that time frame should not have been seized. However, seizure of documents outside the time frame of a warrant does not necessarily bar their admission into evidence. See, e.g., United States v. Slocum, 708

F.2d 587, 603 (11th Cir.1983) (noting that searching agents could permissibly examine documents dated earlier than time limitation in search warrant where documents were located in proximity to documents within time scope, and stating that where there are allegations of ongoing fraud, "'evidence of illegal activity in the past would be relevant to the conspiracy, while records of legitimate transactions prior to the conspiracy will help determine how and when the fraud scheme began'") (quoting *United States v. Zanche*, 541 F.Supp. 207, 210 (W.D.N.Y.1982)).

The Defendants questioned Agent Thomas to some extent regarding his understanding of *Slocum* prior to the search, and his testimony over the course of two days on that issue was inconsistent. However, the Defendants have not shown that the searchers as a whole sought and seized records beyond the time scope. Issues as to admissibility of particular pre–1997 documents may be raised at the next status conference.

### 9. The Computer Search

Finally, the Defendants challenge the manner in which the computer hard drives were seized, copied, and searched. They contend that the seizure was overbroad and that steps were not taken to keep track of what files the searchers viewed on the master hard drive that was created by the FBI Computer Analysis Response Team ("CART") agent.

On the day of the search, 83 computer hard drives were seized from the search sites. These hard drives were then copied and the hard drives themselves were returned to the Defendants approximately one week later. A total of approximately three million computer files were seized. An FBI CART agent then "culled down" these three million computer files to 270,-000 files by eliminating "program" files

and other non-data type files. In reducing the number of potentially-responsive files the CART agent did not open the files to examine them for responsiveness to the warrant but instead removed files based only on type, attempting to leave all data-type files on the resulting "master" hard drive. This master hard drive was then turned over to Agent Thomas and other task force leaders to be searched through the use of text strings for computer documents responsive to the search warrants.

The Defendants criticize the searchers' failure to attempt to search the computers onsite and the compilation of a master hard drive with deletion of only non-data type files. They also assert that the failure of the searchers to keep records of the text-string searches that were run on the "master hard drive" requires suppression. However, the Defendants' arguments are without merit and the Court finds no constitutional infirmity in the execution of the search as it pertains to computers.

The Master Affidavit had explained that the searchers wished to seize the computers for offsite examination and the reasons that this offsite search was necessary. (*See* Master Aff. at 54–57). And, some aspects of a computer search necessarily require a controlled environment and special techniques—for example, the search by a computer expert for electronic "residue." (*See* Master Aff. at 55 ¶ 85c). These reasons for seizure and offsite searching of computers have been recognized as valid ones, and offsite searches of computers have been acknowledged to be less intrusive than onsite searches due to the time involved and the impact that a lengthy onsite search would have on ongoing businesses like those at issue here. *See generally United States v. Hill*, 322 F.Supp.2d 1081, 2004 WL 1376369, at *5–7 (C.D.Cal.2004) (discussing difficulties in conducting computer search).

■ Additionally, although the Defendants contend that computers were indiscriminately seized wholesale from sites, the evidence presented at the hearing shows that steps were taken to determine which computers were responsive to the warrant, including inquiring of employees on the sites as to which computers as those sites contained relevant information. Although some computers that were seized may not have contained information responsive to the warrants, given the nature of computer data and the difficulty of ascertaining what might be contained on a computer hard drive, no egregiousness or flagrant disregard has been shown as to the computer seizure.

Finally, the Defendants argue that the manner in which the master hard drive was compiled and the text string searches were run was unconstitutional. They contend that the "culling down" of files by the CART agent was in reality no culling down at all because none of the data files were eliminated and the task force agents who were given access to the master hard drive thus had free reign to rummage through all of the Defendants' data files. The Defendants also assert that the task force agents who ran text-string searches should have kept records of what text strings were run, what files were looked at, and when and how often the searches were conducted.

However, the computer search has not been shown to be constitutionally infirm. Again, as discussed earlier, it has been recognized that seizure of superfluous computer files is virtually inevitable. Moreover, the CART agent testified that the way in which he reduced the number of computer files—by eliminating the program files—was less intrusive than the alternatives proposed by defense counsel. Although the Defendants assert that, for example, the term "Point Direx" could have been run as a search string and the responsive files eliminated as irrelevant, as explained by the CART agent a file that contained "Point Direx" might also contain information regarding businesses that were the subject of the warrant. (Tr. at 716 (Test. of Scott Skinner)). The CART agent also explained that he could not rely on file names for purposes of determining what was responsive. (Tr. at 715); *cf. United States v. Triumph Capital Group, Inc.*, 211 F.R.D. 31, 63 (D.Conn.2002) ("Few people keep documents of their criminal transactions in a folder marked 'crime records.' ")

And, as to the failure of the searchers to keep records of the text string searches that they ran, while the maintenance of a search log seems feasible and not terribly burdensome to the searchers, the lack of such a record does not in and of itself render the search unconstitutional, at least in the face of testimony from the agents that the text string searches that were run pertained to the issues and entities described in the warrant. For example, names of alien employees were run as search strings, as were dates of spreadsheets, in the agents' attempts to locate responsive computer files. The agents explained that the irrelevant computer files that were pulled up in court at the direction of defense counsel were being seen for the first time in court because no search strings had been run as to which those files were responsive. Thus, searching for "positive hits" was less intrusive—in that irrelevant, nonresponsive files would not be looked at—than the alternative of looking for "negative hits" which would necessitate the opening of such files. In sum, the agents' testimony regarding their limitation of text string searches to the entities and issues of the warrant was credible and no abuse of the Fourth Amendment has been shown as to the computer search.

### D. Return of Property

 Finally, in their motion Mr. Maali and the corporate Defendants also seek the return of seized property that has been retained by the Government. Mr. Maali specifically requests the return of his personal writings, records of his charitable contributions, and records regarding his Ponderosa restaurants. Although the Government reports that it has now returned all Ponderosa records, the Government still refuses to return some of Mr. Maali's documents, claiming that it is entitled to keep them because they are part of a "separate, on-going Grand Jury investigation." (Government's Resp. to Defs.' Arguments in Support of Defs.' Mots. to Suppress, Doc. 430 at 25).

The Government has not persuaded the Court that it is entitled to retain these documents, which it agrees are not within the scope of the warrant and which it does not intend to introduce at trial. The Government shall return the documents to Mr. Maali within twenty (20) days of the date of this Order.

### III. Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** that the Motion of Defendant Saleem Khanani to Suppress Unlawfully Seized Evidence (Doc. 243); the Motion to Suppress Tangible Evidence (Doc. 266) filed by Defendant David Portlock; the Motion to Suppress Evidence and for Return of Property (Doc. 282) filed by Defendants Jesse Issa Maali, Big Bargain World, Inc., SS Mart, Inc., Jeans Unlimited, Inc., Denim Unlimited, Inc., Barakat Corporation, and Barakat International, Inc.; and Defendant Portlock's Reply and Supplemental Motion to Suppress Tangible Evidence (Doc. 306) are

**GRANTED in part** and **DENIED in part** as set forth herein.